JS 44 (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Hashim, Majed; Hashim, Ahmed; Hashim, Abdulrahman; Hashim, Jehan; A Gazzaz, Lasmis Talal

## DEFENDANTS

Air Products and Chemicals, Inc.

**(b)** County of Residence of First Listed Plaintiff   Kingdom of Saudi Arabia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See Attachment

Attorneys *(If Known)*

N/A

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☐ 2  U.S. Government
Defendant

☐ 3  Federal Question
*(U.S. Government Not a Party)*

☒ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

### CONTRACT

☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment
& Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted
Student Loans
(Excludes Veterans)
☐ 153 Recovery of Overpayment
of Veteran's Benefits
☒ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### REAL PROPERTY

☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS

**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product
Liability
☐ 320 Assault, Libel &
Slander
☐ 330 Federal Employers'
Liability
☐ 340 Marine
☐ 345 Marine Product
Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle
Product Liability
☐ 360 Other Personal
Injury
☐ 362 Personal Injury -
Medical Malpractice

### CIVIL RIGHTS

☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/
Accommodations
☐ 445 Amer. w/Disabilities -
Employment
☐ 446 Amer. w/Disabilities -
Other
☐ 448 Education

### PERSONAL INJURY

☐ 365 Personal Injury -
Product Liability
☐ 367 Health Care/
Pharmaceutical
Personal Injury
Product Liability
☐ 368 Asbestos Personal
Injury Product
Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal
Property Damage
☐ 385 Property Damage
Product Liability

### PRISONER PETITIONS

**Habeas Corpus:**
☐ 463 Alien Detainee
☐ 510 Motions to Vacate
Sentence
☐ 530 General
☐ 535 Death Penalty
**Other:**
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee -
Conditions of
Confinement

### FORFEITURE/PENALTY

☐ 625 Drug Related Seizure
of Property 21 USC 881
☐ 690 Other

### LABOR

☐ 710 Fair Labor Standards
Act
☐ 720 Labor/Management
Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical
Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement
Income Security Act

### IMMIGRATION

☐ 462 Naturalization Application
☐ 465 Other Immigration
Actions

### BANKRUPTCY

☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal
28 USC 157

### PROPERTY RIGHTS

☐ 820 Copyrights
☐ 830 Patent
☐ 835 Patent - Abbreviated
New Drug Application
☐ 840 Trademark

### SOCIAL SECURITY

☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS

☐ 870 Taxes (U.S. Plaintiff
or Defendant)
☐ 871 IRS—Third Party
26 USC 7609

### OTHER STATUTES

☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC
3729(a))
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and
Corrupt Organizations
☐ 480 Consumer Credit
☐ 485 Telephone Consumer
Protection Act
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/
Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information
Act
☐ 896 Arbitration
☐ 899 Administrative Procedure
Act/Review or Appeal of
Agency Decision
☐ 950 Constitutionality of
State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
Proceeding
☐ 2 Removed from
State Court
☐ 3 Remanded from
Appellate Court
☐ 4 Reinstated or
Reopened
☐ 5 Transferred from
Another District
*(specify)*
☐ 6 Multidistrict
Litigation -
Transfer
☐ 8 Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332
Brief description of cause:
Shareholders' derivative suit for breach of contract and business tort claims

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
An amount greater than $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE

DOCKET NUMBER

FEB 28 2020

DATE
02/28/2020

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #         AMOUNT         APPLYING IFP         JUDGE         MAG. JUDGE

JS 44 Reverse  (Rev. 02/19)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III. **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V. **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.



### Attachment to Civil Cover Sheet

**Attorneys for Plaintiffs**                    20          1213

Tarek F. Abdalla, Bar No. 59924
Andy R. Stanton, Bar No. 93409 (Pro Hac Vice Motion to be Filed)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, Pennsylvania  15219
Telephone:  (412) 391-3939



**20   1213**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: **8858 Al-Amir Sultan Street Al-Khalidiyah, Jeddah 23423-3801 Kingdom of Saudi Arabia**

Address of Defendant: **7201 Hamilton Blvd. Allentown, PA 18195-1501**

Place of Accident, Incident or Transaction: **Pennsylvania and The Kingdom of Saudi Arabia**

---

**RELATED CASE, IF ANY:**

Case Number: _____   Judge: _____   Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?   Yes ☐   No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?   Yes ☐   No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?   Yes ☐   No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?   Yes ☐   No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: **02/28/2020**   _Tarek Abdalla_   **59924**
*Attorney-at-Law / Pro Se Plaintiff*   *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.   *Federal Question Cases:***

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☐ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
  *(Please specify):* _____

**B.   *Diversity Jurisdiction Cases:***

- ☑ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☑ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, **Tarek F. Abdalla**, counsel of record *or pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

FEB 28 2020

DATE: **02/28/2020**   _Tarek Abdalla_   **59924**
*Attorney-at-Law / Pro Se Plaintiff*   *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)



**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| Majed Hashim A Hashim, et. al., | : | CIVIL ACTION |
| v. | : | 20   1213 |
| Air Products and Chemicals, Inc. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits.                                                     ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.                                                                                                                  ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court. (See reverse side of this form for a detailed explanation of special
management cases.)                                                                                                                  (X)

(f) Standard Management – Cases that do not fall into any one of the other tracks.                   ( )

| | | |
|---|---|---|
| 2/28/2020 | Tarek F. Abdalla | Majed Hashim A Hashim, et. al. |
| **Date** | **Attorney-at-law** | **Attorney for** |
| (412) 391-3939 | (412) 394-7959 | tabdalla@jonesday.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

FEB 28 2020



**Civil Justice Expense and Delay Reduction Plan**
**Section 1:03 - Assignment to a Management Track**

(a)        The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)        In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management.  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)        The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)        Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)        Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

**SPECIAL MANAGEMENT CASE ASSIGNMENTS**
**(See §1.02 (e) Management Track Definitions of the**
**Civil Justice Expense and Delay Reduction Plan)**

Special Management cases will usually include that class of cases commonly referred to as "complex litigation" as that term has been used in the Manuals for Complex Litigation.  The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985.  This term is intended to include cases that present unusual problems and require extraordinary treatment.  See §0.1 of the first manual.  Cases may require special or intense management by the court due to one or more of the following factors:  (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition.  It may include two or more related cases.  Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues.  See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MAJED HASHIM A HASHIM, AHMED HASHIM A HASHIM, ABDULRAHMAN HASHIM A HASHIM, SARA HASHIM A HASHIM, JEHAN HASHIM A HASHIM, and LASMIS TALAL A GAZZAZ, individually and derivatively on behalf of UNITED WELDING AND SUPPLIES COMPANY LTD., | ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| AIR PRODUCTS AND CHEMICALS, INC., | ) |
| Defendant. | |

**VERIFIED COMPLAINT**

Civil Action No. **20      1213**

Judge _____

**PRELIMINARY STATEMENT**

1.      Defendant Air Products and Chemicals, Inc. ("Air Products" or "Defendant") strategically partnered with an established Saudi company, United Welding and Supplies Company Ltd. ("AHWAS"), to gain a foothold in the Saudi market, where Air Products hoped to build business relationships with AHWAS's contacts and customers.  Although Air Products promised that it would only do business in Saudi Arabia with AHWAS as its partner, it used and then dropped AHWAS, violating the parties' contract in the process.  Then, to clean up its trail, Air Products induced AHWAS' General Manager to turn a blind eye to Defendant's blatant violations.

2.      Plaintiffs – shareholders in AHWAS, a limited liability company registered in the Kingdom of Saudi Arabia – bring this action both derivatively, on behalf of AHWAS, and directly in their own capacity, seeking damages for repeated violations of a non-compete agreement by Air Products Leasing B.V. ("Air Products B.V.") and its parent company, Defendant Air Products, as well as for tortious conduct.  Defendant is a resident of Pennsylvania.

7.      AHWAS was able to provide these relationships to Defendant and its affiliates, but required the Non-Compete and Letter of Undertaking so that Defendant could not take advantage of the information and relationships it had obtained to cut AHWAS out of future projects.

8.      In or around April 2019, the AP Managers indicated for the first time that Air Products B.V. was unsatisfied with AHG's performance, and made an unsolicited offer to buy out AHWAS' interest, or sell its own, in AHG.

9.      In performing preliminary due diligence relating to this offer, Plaintiffs discovered for the first time that only a few months earlier, in or around August 2018, Air Products B.V. had unilaterally entered into a project with Saudi Aramco on its own, cutting AHWAS out of the picture in violation of the Non-Compete.

10.      This breach harmed AHG and AHWAS by depriving them of the opportunity to participate in a project with Saudi Aramco (historically their largest customer). But in addition, it will continue to cause them further harm because the project will result in the production of excess industrial gases, which will compete directly with AHG and AHWAS and depress prices in the marketplace, thus decreasing AHG and AHWAS' profits.

11.      Upon further investigation, Plaintiffs learned that Air Products had circumvented the agreement in past instances, and that there had been additional historical violations of the Non-Compete by Air Products and its affiliates, for which they did not obtain prior written consent, as required by the Non-Compete. As a result of Air Products' violative conduct, AHWAS and AHG have lost other opportunities to engage in projects.

12.      Upon discovering Air Products B.V.'s violative conduct, on or around July 8, 2019, Plaintiffs directed the management of AHWAS to obtain counsel to further investigate Air

- 3 -

Products B.V.'s actions, and, potentially pursue claims against Defendant. The management of AHWAS did obtain counsel in the Kingdom of Saudi Arabia, who recommended pursuing litigation, and even drafted a complaint to do so.

13. However, following a private meeting with the AP Managers, the management of AHWAS abandoned the lawsuit, and has refused to take any action to protect the interests of AHWAS or Plaintiffs. Moreover, the management of AHWAS has refused to provide any information about its communications with Air Products B.V., including any efforts to vindicate AHWAS' contractual rights against Defendant or its subsidiaries.

14. Under the laws of the Kingdom of Saudi Arabia, Plaintiffs have standing to pursue claims against Defendant in this Court, both directly in their own right, and derivatively on behalf of AHWAS.

**PARTIES**

15. Plaintiff Majed Hashim A Hashim ("Majed Hashim") is a resident of the Kingdom of Saudi Arabia.

16. Plaintiff Majed Hashim has served on the Board of Managers of AHG since 2018.

17. Plaintiff Ahmed Hashim A Hashim is a resident of the Kingdom of Saudi Arabia.

18. Plaintiff Abdulrahman Hashim A Hashim is a resident of the Kingdom of Saudi Arabia.

19. Plaintiff Sara Hashim A Hashim is a resident of the Kingdom of Saudi Arabia.

20. Plaintiff Jehan Hashim A Hashim is a resident of the Kingdom of Saudi Arabia.

21. Plaintiff Lasmis Talal A Gazzaz is a resident of the Kingdom of Saudi Arabia.

22. Collectively, Plaintiffs own 16% of AHWAS, a limited liability company registered in the Kingdom of Saudi Arabia with commercial registration number 4030121304,

dated 26/12/1417H (corresponding to 04/05/1997G), whose registered office is at PO Box 44, Madina Road, Jeddah, Kingdom of Saudi Arabia.

23.    Plaintiffs have been shareholders of AHWAS at all times relevant herein, or inherited their ownership in AHWAS by operation of law from a decedent who was a shareholder at all times relevant herein.

24.    Plaintiffs fairly and adequately represent the interests of shareholders who are similarly situated in enforcing the rights of AHWAS.

25.    Upon information and belief, the remaining 84% of AHWAS is controlled by Khalid Hashim A Hashim ("Khalid Hashim") through a combination of his personal ownership and a power of attorney to represent other shareholders.

26.    In addition to controlling a majority of shares, Khalid Hashim is the General Manager of AHWAS.

27.    Pursuant to the Shareholders' Agreement, AHWAS is, in turn, a 75% shareholder of Abdullah Hashim Industrial Gases & Equipment Co. Ltd. ("AHG"), a limited liability company incorporated in the Kingdom of Saudi Arabia under commercial registration number 4030121304, dated 15/04/1400H.

28.    Pursuant to the Shareholders' Agreement, the other 25% of AHG is owned by Air Products Leasing B.V., which is incorporated and registered in the Netherlands with company number 29048444, whose registered office is at Kanaalweg 15, 3526 KL, Ultrecht, Netherlands.

29.    On information and belief, Defendant is a publicly registered corporation, registered in Delaware, with its principal place of business in Lehigh County, Pennsylvania.

30.    As represented in the Letter of Undertaking, Defendant directly or indirectly owns 100% of the outstanding common stock of Air Products B.V., and is in "full control" of AP.

- 5 -

31.    This ownership structure is illustrated below.



## JURISDICTION AND VENUE

32.    This court has diversity jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(a)(2).  Defendant is a citizen of Pennsylvania, as that is the location of its principal place of business, pursuant to 28 U.S.C. § 1332(c)(1).  Plaintiffs are citizens of the Kingdom of Saudi Arabia, and are not lawfully admitted for permanent residence in the United States or domiciled in Pennsylvania.  Plaintiffs seek damages in an amount greater than $75,000.

33.    Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(1) as Defendant resides in this judicial district.  Additionally, venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

34.    Jurisdiction and venue are also proper in this district as the parties have elected that any disputes under the Letter of Undertaking "shall be referred to the courts of the State of Commonwealth of Pennsylvania for resolution."

## BACKGROUND ON THE INDUSTRIAL GASES MARKET IN SAUDI ARABIA

35.     Industrial gases, generally, are those gas products that are manufactured and sold for use in industry, including gases used in the energy, petrochemicals, metal and metallurgy, chemicals, healthcare, automotive, aerospace, and food and beverages industries and other industries.

36.     In Saudi Arabia and the surrounding region, the industrial gases market consists of two segments:  the merchant gases segment and the project segment.

37.     The merchant gases segment of the industrial gases market refers generally to the manufacturing, trading, and distribution of industrial gases for use in other industries.

38.     Conversely, in the project segment, a participant builds and operates facilities to manufacture industrial gases on-site for use by another entity, for example, an oil refinery, petrochemical plant, or plant.

39.     In general, the project market operates on a larger scale.

40.     The merchant segment usually relies on economic cycles, such that, for example, since the Saudi economy has suffered since about 2014 as a result of declining oil prices, the merchant segment has also suffered.

41.     Conversely, the project segment is more insulated from economic cycles, instead relying on expansion in the oil and gas industry.  For that reason, the project segment has provided opportunities in Saudi Arabia in the same timeframe that the merchant segment has suffered.

## HISTORY OF AHWAS, SARGAS, AND AHG AND INVOLVEMENT WITH SAUDI ARAMCO

42.     Prior to 2012, the Hashim family collectively owned 100% of AHWAS, Saudi

Arabian Refrigerant Gases Co., Ltd. ("Sargas"), and AHG (collectively, the "Abdullah Hashim

Group").  The ownership structure is illustrated below:



43.     AHG, established in 1955, is a leading manufacturer and supplier of industrial and

medical gases in the Kingdom of Saudi Arabia and the surrounding region.

44.     Sargas was established in 1976 in Jeddah industrial city, and is a market leader in

the importing, storing, refilling, and selling of refrigerant gases in Saudi Arabia and the

surrounding region.

45.     AHWAS, established in 1955, is a market leader in trading welding and cutting

equipment and welding consumables, related accessories, and safety products in Saudi Arabia

and the surrounding region.

46.     As of 2011, the Abdullah Hashim Group was the largest private industrial gases

company in Saudi Arabia, and remains so today in the merchant segment.

47.     All three companies have an established history of working extensively with

many key government and semi-governmental entities in Saudi Arabia and the surrounding

## HISTORY OF AIR PRODUCTS IN THE REGION

52.     Upon information and belief, before entering into partnerships with the Abdullah Hashim Group, the Defendant and its affiliates' presence in the GCC was limited to supplying equipment to other entities.

53.     Specifically, upon information and belief, Defendant and its affiliates had no pre-existing industrial gases merchant or project work with Saudi Aramco.

54.     Upon information and belief, the AJWAA JVs allowed Air Products B.V. to expand its GCC business beyond merely supplying equipment to other entities, by engaging in the production and distribution of industrial gases in the region for the first time.

## 2012 SHAREHOLDERS' AGREEMENT

55.     In or around 2011, the Abdullah Hashim Group and Air Products B.V. agreed to extend their partnership in order to expand both entities' operations in Saudi Arabia and the surrounding region.

56.     In 2012, the Hashim family restructured its ownership of AHG, Sargas, and AHWAS, transferring all of its business lines to AHG, so that Air Products B.V. could acquire a 25% ownership interest in AHG.

57.     Following the restructuring, the Hashim family retained 100% of both Sargas and AHWAS.  AHWAS, in turn, owned 75% of AHG, with Air Products B.V. acquiring the other 25% from the Hashim family.  The Hashim family transferred its 50% interest in the AJWAA JVs to Sargas, with Air Products B.V. retaining its 50% interest.

58.    The post-2012 ownership structure is illustrated below:



59.    In a press release announcing its planned acquisition of a 25% interest in AHG,

Air Products stated that it was motivated to enter the transaction by AHG's position as a market

leader, as well as the opportunity to enter a significant new platform from which to pursue

tonnage gases opportunities in the GCC:

> "AHG is a long-established, respected and financially strong
> business, run by an experienced leadership team," said Howard
> Castle-Smith, Air Products' vice president and general manager,
> Tonnage Gases, Europe and Middle East. "Merchant gases growth
> in The Kingdom is high, and margins are strong, making it an
> attractive investment. It's also a significant new platform from
> which to pursue tonnage gases opportunities in The Middle East."[1]

60.    Likewise, in that same press release, the General Manager of AHG explained that

AHG's motivation for entering the transaction was the ability to expand its business across the

GCC, as the two businesses would be "stronger together":

> "We see Air Products as the ideal partner to expand our business
> across The Middle East," said Khalid Hashim, AHG's managing
> director. "Our relative strengths – AHG in the supply of merchant
> gases and Air Products in large scale tonnage plants – make us

---

[1] *Available at* http://www.airproducts.ae/Company/news-center/2011/09/0929-air-products-secures-25-percent-stake-in-gases-businesses-of-abdullah-hashim-group-uk.aspx.

stronger together. Of course, Air Products is a leader in merchant gases in many other parts of the world, and I expect us to benefit from their capability in new technologies and product innovation that we will offer to our customers and prospects."

61.     In connection with Air Products B.V.'s acquisition of a 25% stake in AHG, AHWAS and Air Products B.V. entered into the Shareholders' Agreement.

62.     Article 1 of the Shareholders' Agreement defines "Partners" as "AHWAS and AP."

63.     Pursuant to Article 2 of AHG's Articles of Association (attached hereto as Exhibit 3), the "Objects" of AHG are:

> [W]holesale and retail trade and import of atmospheric gases (oxygen, nitrogen, argon, acetylene, medical nitrous oxide, carbon dioxide, and other industrial, medical, special (blended) gases, refrigerant gases and different gases, as well as necessary cylinders and containers, di-fluoro ethylene, atmospheric and medical gas equipment and devices, tools and equipment, fire extinguishers, tools, equipment for industrial maintenance workshops, and equipment for atmospheric, industrial and gas plants, antirust materials, medical gas networks, safety tools and other industrial equipment;
>
> [T]he production of atmospheric gases (oxygen, nitrogen, helium, argon, acetylene, medical nitrous oxide, hydrogen, helium, ammonia, nitrous oxide gas, carbon dioxide gas, liquid air, compressed air, acetylene gas) and other industrial and medical gases, mixed gases, specific gases and Freon, and the production of liquid hydrocarbons and high-purity hydrogen gas, and extinguishers;
>
> [A]s well as installation of plants for manufacturing of atmospheric, industrial and medical gases together with their accessories for external customers in accordance with licenses granted to these customers; extension, maintenance and setting up of medical and industrial gas networks, supply of various gases to plants through direct supply lines, maintenance, operation and management of gas plants and their utilities, processing or safe disposal of all types of waste by applicable scientific methods, (and the setting up of a filling plat for all types of refrigerant gases manufactured by Deron De Nomo International.

64.     Section 21 of the Shareholders' Agreement provides for the application of the

laws of Saudi Arabia:

> 21.1    This Agreement and any disputes or claims arising out of or in connection with its subject matter are governed by and construed in accordance with the law of Saudi Arabia.

> 21.2    The Partners shall endeavor to settle all matters arising under this Agreement amicably, but all disputes arising in connection with this Agreement not settled amicably within a reasonable period shall be finally resolved by the competent courts of Saudi Arabia.

65.     Article 22 of the Shareholders' Agreement is the Non-Compete, which provides:

> 22.1    As long as a Partner is a Partner in the Company and for three (3) years thereafter, the Partners undertake to cooperate together in the interests of the Company and they agree that none of the Partners will participate directly or indirectly, in any other business in Saudi Arabia that is similar to the industrial and commercial business of the Company as described in the Company's Articles of Association as at the date of this Agreement, an extract of which is attached at Appendix 1. In particular, subject to Clause 22.2 below, neither Partner shall, and each Partner shall procure that none of its Affiliates[2] will, as long as it is a Partner in the Company and for three (3) years thereafter, engage, directly or indirectly, in any activities that compete or conflict with the business of the Company in Saudi Arabia including, but not limited to, the following, without the prior written consent of the other Partner:

>> (a)     [P]roviding any product or service where a material component of such product or service competes or conflicts with the business of the Company;

---

[2]     Article 1.1 of the Agreement defines (A) an **Affiliate** as, in relation to any Party, any entity which Controls or, is directly or indirectly Controlled by or under common Control with, such Party, provided that the Company shall be deemed not to be an Affiliate of any Party; and (B) Control as Control: in relation to any person (the **"First Person"**), the right of another person or persons acting together, whether in law or in fact, to secure by means of the holding of a number of shares bearing more than 50% of the voting rights attaching to all the shares in the First Person, or by having the power to control. the composition of the board of directors or other governing body of the First Person, that all or a substantial proportion of the affairs of the First Person are conducted in accordance with the wishes of that person or persons and the expressions **"Controls"** or **"Controlled"** shall be construed accordingly.

(b)   [P]articipating (whether as shareholder, partner or otherwise and whether directly or indirectly) in any project, business or activity where a material component of such project, business or activity competes or conflicts with the business of the Company;

(c)   [E]ither on its own account or in conjunction with or on behalf of any other person, employing, soliciting or enticing. away or attempting to employ, solicit or entice away from the Company any person who is an officer, manager, consultant or employee of the Company or an employee of any Party seconded to the Company whether or not such person would commit a breach of contract by reason of leaving such employment without the prior written agreement of the Parties; or

(d)   [E]ither on its own account or in conjunction with or on behalf of any other person, soliciting or enticing away or attempting- to solicit or entice. away from the Company any person who is a customer, client, prospective customer or client, agent or correspondent of the Company.

22.2   The restrictions set forth in Clause 22.1 shall not apply to:

(a)   The business conducted by Air Products Yanbu Limited's branch in Saudi Arabia prior to the date of this Agreement pursuant to foreign investment license No. (820/1) dated 21/10/1424H, in such form, size, and magnitude as currently conducted as at the date of this Agreement;

(b)   Any services contract related to AP's customer plant support division, provided that such contract shall have an aggregate value of not less than 10% of the Company's annual turnover for the immediately preceding year;

(c)   [A]ny large air separation or large hydrogen project undertaken by AP or its Affiliates provided however that such project shall have a value of not less than three times the Company's annual turnover for the immediately preceding year and that AP shall give the Company, AHWAS and/or any of their

Affiliates a right of first refusal to participate in the entity undertaking the project in such proportion as may be mutually agreed between the parties;

(d)     [A]ny project that the Company does not qualify for, provided however that, subject to the bid requirement, AP shall give the Company, and/or AHWAS or its affiliates a right of first refusal to participate in the entity undertaking the project.

22.3    The Company will grant AP the status of preferred supplier for machinery, equipment and products that it needs to purchase from third parties provided that AP offers terms that are competitive and in accordance with the then prevailing market conditions.

66.     The significance of the Non-Compete is that it forbids either party from soliciting or entering into any project that is similar to the business of AHG, in terms that are both broad and categorical, absent the application of a narrow, and specifically defined list of carve-outs from liability.

67.     Prior to entering the Shareholders' Agreement, Defendant executed the Letter of Undertaking, which provides:

1.      APCI is aware of a Shareholders' Agreement dated 29 May 2012 that you have entered into with Air Products Leasing B.V.

2.      APCI directly or indirectly owns 100% of the outstanding common stock of Air Products Leasing B.V.  APCI is not taking or planning on taking any action to reduce its direct or indirect ownership interest in or full control of Air Products Leasing B.V. and APCI shall, at all times, ensure that Air Products Leasing B.V., or any transferee of Air Products Leasing B.V., remains directly or indirectly, a wholly owned subsidiary of APCI and under its full control.

3.      APCI shall procure that Air Products Leasing B.V., conducts its business in such a way as to be able to meet its obligations under the said Shareholders' Agreement and, in particular, comply with the non-compete provisions therein.

    4.      This undertaking shall be governed by the laws of the State of Commonwealth of Pennsylvania and disputes thereunder shall be referred to the courts of the State of Commonwealth of Pennsylvania for resolution.

68.     Air Products B.V. acquired its interest in AHG in order to develop relationships and business with key companies in Saudi Arabia, including Saudi Aramco.

69.     Defendant executed the Letter of Undertaking in order to induce AHWAS to partner with Air Products B.V. in developing business and relationships with key companies in Saudi Arabia, including Saudi Aramco.

70.     AHWAS was able to provide these relationships to Defendant and its affiliates, but required the Non-Compete so that Defendant could not take advantage of the information and relationships it had obtained and circumvent AHWAS in future dealings with AHWAS' customers in Saudi Arabia.

71.     AHWAS would not have agreed to Air Products B.V.'s acquisition of 25% of AHG absent the Non-Compete in the Shareholders' Agreement.

72.     AHWAS would not have agreed to Air Products B.V.'s acquisition of 25% of AHG absent Defendant's agreement to procure the compliance of Air Products B.V. with the Shareholders' Agreement, and specifically with the Non-Compete.

## PLAINTIFFS' INVOLVEMENT IN THE GOVERNANCE OF AHG

73.     Pursuant to Section 3.3 of the Shareholders' Agreement, AHG is "managed by a Board of Managers composed of eight (8) managers, six (6) of whom [are] appointed by AHWAS and the remaining two (2) [of whom are] appointed by AP."

74.     From the date of the 2012 restructuring until his death in September 2017, Plaintiff Majed Hashim's father, Hashim A Hashim, was appointed by AHWAS to serve on the Board of Managers of AHG.

75.     During this time period, Plaintiff Majed Hashim attended most board meetings for AHG, either with his father or as his father's duly-authorized proxy.

76.     Following his father's death, Plaintiff Majed Hashim was appointed to the Board of Managers, effective October 15, 2018. He has attended every board meeting since his appointment.

77.     As such, Plaintiff Majed Hashim has attended most AHG Board of Managers meetings since Air Products B.V. acquired its 25% stake in the company in or around May 2012.

78.     Plaintiffs Ahmed Hashim and Abdulrahman Hashim have also attended most board meetings since Plaintiff Majed Hashim was appointed to the Board of Managers in October 2018.

**HISTORY OF AHG AFTER AIR PRODUCTS B.V. ACQUIRED ITS INTEREST**

79.     Following Air Products B.V.'s acquisition, AHG continued to work regularly with Saudi Aramco.

80.     Air Products B.V.'s partial acquisition of AHG allowed it to expand its business in the GCC, developing relationships with many key participants in the Saudi market.

81.     For example, prior to 2012, upon information and belief, Air Products B.V.'s relationship with Saudi Aramco, if any, was limited to supplying equipment.

82.     Air Products B.V.'s partial acquisition of AHG allowed it to engage in industrial gases project work with Saudi Aramco for the first time.

**PLAINTIFFS' DISCOVERY OF AIR PRODUCTS B.V.'S VIOLATIONS OF THE NON-COMPETE**

83.     On or about April 23, 2019, at AHG's Annual General Meeting, the AP Managers stated, for the first time, that Air Products B.V. was dissatisfied with its partnership with AHWAS, claiming to be dissatisfied with AHG's financial performance.

- 17 -

84.     The claim that Air Products was dissatisfied with its partnership was a surprise to Plaintiffs because AHG's work in the project sector of the industrial gases market had provided opportunities to Air Products B.V. to establish, for the first time, a business in the production and supply of industrial gases in the region.

85.     On or about April 23, 2019, the General Manager of AHWAS, Khalid Hashim, informed Plaintiffs that the AP Managers had communicated an intent to acquire AHWAS' interest, or to sell its own interest, in AHG.

86.     Prior to the April 2019 meeting, Air Products had never expressed any dissatisfaction with its partnership with AHWAS.

87.     Prior to the April 2019 meeting, Air Products had never expressed any interest in buying out AHWAS, or in selling its own interest in AHG.

88.     Upon learning of Air Products' planned offer to acquire AHWAS' interest or sell its own, Plaintiffs began investigating the activities of Air Products B.V. and the AP Managers in Saudi Arabia.

89.     In this investigation, Plaintiffs discovered for the first time that Air Products B.V. had circumvented AHWAS and AHG, and violated the Non-Compete by soliciting and participating in a project with Saudi Aramco that is "similar to the industrial and commercial business" of AHG, and therefore fits squarely within the scope of conduct forbidden by the Non-Compete (the "Aramco Project").

90.     Specifically, Plaintiffs discovered that, on August 12, 2018, Air Products had

issued a press release entitled "Saudi Aramco, Air Products, and ACWA Power to Form Over $8

Billion Gasification/Power Joint Venture at Jazan Economic City."  Air Products B.V.'s press

release provided in part:

> The JV will own and operate the facility under a 25-year contract
> for a fixed monthly fee. Saudi Aramco will supply feedstock to the
> JV, and the JV will produce power, hydrogen and other utilities for
> Saudi Aramco. Air Products will own at least 55 percent of the JV,
> with Saudi Aramco and ACWA Power owning the balance.[3]

91.     The Aramco Project featured an air separation component.

92.     Plaintiffs further discovered that, on February 25, 2019, Air Products had issued

another press release announcing completion of the Aramco Project, titled "Air Products

Reaches Mechanical Completion of World's Largest Industrial Gas Complex in Jazan, Saudi

Arabia With Zero Lost Time Injuries in 25 Million Worker Hours."  Air Products B.V.'s press

release provides in part:

> In April 2015, Air Products announced it had been awarded a 20-
> year contract by Saudi Aramco, the world's largest company, under
> a joint venture (JV) of Air Products (25%) and ACWA Holding
> (75%) to build, own and operate the world's largest industrial gas
> complex to supply 75,000 metric tons per day (20,000 oxygen and
> 55,000 nitrogen) to Saudi Aramco's refinery and Integrated
> Gasification Combined Cycle being built in Jazan, Saudi Arabia.[4]

93.     The Aramco Project, as described by Defendant, fits squarely within the scope of

conduct covered by the Non-Compete.

---

[3] *Available at* http://www.airproducts.com/Company/news-center/2018/08/0812-jazan-gasification-jv.aspx.

[4] *Available at* http://www.airproducts.com/Company/news-center/2019/02/0225-air-products-mechanical-completion-of-industrial-gas-complex-in-jazan.aspx.

94.     Despite its obligation to provide AHG and AHWAS an opportunity to participate in competing projects, Air Products B.V. did not obtain the written consent of AHG or AHWAS before engaging in the Aramco Project.

95.     Despite its obligation to procure Air Products B.V.'s compliance with the Non-Compete, Air Products did not cause Air Products B.V. to obtain written consent from AHG or AHWAS, as required by the Non-Compete.

96.     AHG and AHWAS had the ability to participate in the Aramco Project had Defendant provided the opportunity to do so.

97.     As AHWAS' General Manager Khalid Hashim stated in the press release announcing Air Products B.V.'s planned partial acquisition of AHG, AHWAS "s[aw] Air Products as the ideal partner to expand our business across the Middle East."[5]

98.     Given that AHWAS' goal in entering into business with Air Products B.V. was to expand its business in the region, it would have participated in the Aramco Project had Defendant provided the opportunity to do so.

99.     Air Products B.V.'s entry into the Aramco Project harmed AHG and AHWAS by depriving them of the opportunity to participate in a project with Saudi Aramco, historically their largest customer.

100.    Air Products B.V.'s entry into the Aramco Project also harmed AHG and AHWAS because the project will result in the production of excess industrial gases which will directly compete with the business of AHG and AHWAS and decrease AHG and AHWAS's profits.

_____

[5] *Available at* http://www.airproducts.ae/Company/news-center/2011/09/0929-air-products-secures-25-percent-stake-in-gases-businesses-of-abdullah-hashim-group-uk.aspx.

101.    Upon learning of the Aramco Project, Plaintiffs began to investigate Air Products B.V.'s activities further, and discovered that, beginning in or around 2012, Air Products B.V. and/or its affiliates had solicited and entered into a series of other contracts by which it "participated [both] directly [and] indirectly, in … other business[es] in Saudi Arabia that [are] similar to the industrial and commercial business of [AHG]" in violation of the Non-Compete.

102.    All of these projects fit squarely within the scope of the Non-Compete.

103.    Despite its obligations to provide AHG the opportunity to participate in competing projects, Air Products B.V. did not obtain the written consent of AHG or AHWAS before entering into any competing projects.

104.    Despite its obligations to procure Air Products B.V.'s compliance with the Non-Compete, Defendant did not cause Air Products B.V. to obtain the written consent of AHG or AHWAS prior to engaging in any competing projects.

105.    AHG and AHWAS had the ability to, and would have participated in the competing projects had Defendant provided the opportunity to do so.

106.    Upon information and belief, the AP Managers, in violation of their fiduciary duties to Plaintiffs and of the Non-Compete, were directly involved in Air Products B.V.'s solicitation of, and participation in, the competing projects, including the Aramco Project.

107.    Defendant, being in "full control" of Air Products B.V. (as represented in the letter of undertaking), either directed the AP Managers to "solicit[] or entic[e] away from [AHG]" its "customer[s], client[s], prospective customer[s] or client[s], agent[s] or correspondent[s] of [AHG]" in violation of their fiduciary duties to Plaintiffs as well as the Non-Compete, or failed to prevent the AP Managers from doing so, as required by the Letter of Undertaking.

- 21 -

108.    Defendant, being in "full control" of Air Products B.V. (as represented in the Letter of Undertaking), either directed the AP Managers to participate in the competing projects, including the Aramco Project, in violation of their fiduciary duties to Plaintiffs as well as the Non-Compete, or failed to prevent the AP Managers from doing so, as required by the Letter of Undertaking.

109.    Defendant, being in "full control" of Air Products B.V. (as represented in the Letter of Undertaking), either directed the AP Managers not to obtain the written consent of AHG and AHWAS prior to participating in the competing projects, including the Aramco Project, in violation of their fiduciary duties to Plaintiffs as well as the Non-Compete, or failed to direct the AP Managers to do so, as required by the Letter of Undertaking.

110.    On or about June 9, 2019, Air Products B.V. made an offer to buy out AHWAS' interest, or to sell its own interest, in AHG and the AJWAA JVs (the "Offer to Purchase or Sell").

111.    The Offer to Purchase or Sell provides "[w]e, Air Products Leasing B.V. ... as your partners . . . believe that the best way for [AHG and the AJWAA JVs] to become successful and to protect the value of [the] business is for one of us to have sole ownership."

112.    In its offer, Air Products B.V. did not disclose the basis for its offer or for the valuation included therein.

113.    Upon information and belief, Defendant, being in "full control" of Air Products B.V. (as represented in the Letter of Undertaking), directed the AP Managers to deliver the Offer to Purchase or Sell, without disclosing its entry into projects that were competitive with AHG and AHWAS, in violation of the AP Managers' fiduciary duties to Plaintiffs and in an improper

- 22 -

attempt to relieve itself of its non-compete obligations, which it repeatedly and knowingly violated.

## PLAINTIFFS' EFFORTS TO DIRECT AHWAS TO PURSUE LITIGATION

114.    Upon learning of Air Products B.V.'s Offer to Purchase, and competing projects, on or about July 8, 2019, Plaintiffs directed the General Manager of AHWAS, Khalid Hashim to retain counsel to review Air Products B.V.'s actions, and, potentially pursue litigation against Defendant.

115.    Khalid Hashim retained local counsel in Saudi Arabia on Plaintiffs' direction.

116.    After meeting with Khalid Hashim and Plaintiffs, AHWAS' counsel concluded that Air Products B.V.'s actions violated the Non-Compete, and recommended pursuing litigation.

117.    On or about July 11, 2019, AHWAS' counsel prepared a draft complaint based on Air Products B.V.'s actions, which he sent to Khalid Hashim and to Plaintiffs.

118.    On or about July 18, 2019, Plaintiff Majed Hashim recommended that AHWAS replace its counsel with an international law firm, better equipped to pursue litigation in Pennsylvania pursuant to the Letter of Undertaking.

119.    Khalid Hashim did not replace AHWAS' counsel, or indeed reply to Plaintiff Majed Hashim's recommendation at all.

120.    On or about July 24, 2019, Khalid Hashim had a private meeting with the AP Managers in Dammam in the Kingdom of Saudi Arabia.  Khalid Hashim had a second private meeting with the AP Managers, or other of the Defendant's agents, on or around September 30, 2019.

121.    The July 11, 2019 draft complaint was never filed.

- 23 -

122.    Since his July 24, 2019 meeting with the AP Managers, Khalid Hashim has refused to discuss with Plaintiffs the substance of Air Products B.V.'s actions, AHWAS' abandoned plans to pursue litigation, or his communications with Air Products B.V.

123.    Upon information and belief, since his July 24, 2019 meeting with the AP Managers, Khalid Hashim has pursued his own interests instead of, and to the detriment of, the interests of AHWAS' shareholders.

124.    This action is not a collusive one to confer jurisdiction that the court would otherwise lack.

125.    Plaintiffs have standing, and are authorized to bring these claims under the laws of the Kingdom of Saudi Arabia.

## COUNT I

### Derivative Claim on Behalf of AHWAS for Breach of Contract

126.    Plaintiffs incorporate all prior paragraphs herein by reference as if each of the allegations were fully set forth herein.

127.    On or around May 29, 2012, through the execution of the Shareholders' Agreement, Air Products B.V. entered into a valid, binding, and enforceable contract, supported by consideration, to comply with the terms of the Non-Compete provision contained therein.

128.    As set forth herein, in violation of its obligation, Air Products B.V. solicited and entered into a series of contracts, including, but not limited to, the Aramco Project, which fit squarely within the scope of conduct barred by the Non-Compete provision without obtaining AHWAS' or AHG's prior written consent to do so.

129.    As set forth herein, in addition to depriving AHWAS of its contractual right to participate in the projects, the Aramco Project will result in the production of excess industrial

- 24 -

gases, which will compete directly with AHG and AHWAS, and depress prices in the marketplace.

130.    On or around May 9, 2012, through the execution of the Letter of Undertaking, Defendant entered into a valid, binding, and enforceable contract, supported by consideration, to procure Air Products B.V.'s compliance with the Shareholders' Agreement, and specifically with the Non-Compete provision contained therein.

131.    As represented by the Letter of Undertaking, Defendant was, and remains, in "full control" of Air Products B.V.

132.    In violation of its duties under the Letter of Undertaking, Defendant directed Air Products B.V. to participate in the competing projects, including the Aramco Project, and/or failed to prevent Air Products B.V. from doing so, without obtaining prior written consent.

133.    By reason of the foregoing breaches, Defendant has caused AHWAS to incur damages in an amount to be determined at trial.

### COUNT II

**Derivative Claim on Behalf of AHWAS for
Tortious Interference with AHWAS' Relationship with Air Products B.V.**

134.    Plaintiffs incorporate all prior paragraphs herein by reference as if each of the allegations were fully set forth herein.

135.    On or around May 29, 2012, through the execution of the Shareholders' Agreement, Air Products B.V. entered into a valid, binding, and enforceable contract, supported by consideration, to comply with the terms of the Non-Compete provision contained therein.

136.    Defendant is aware of Air Products B.V.'s entry into the Non-Compete, and is in "full control" of Air Products B.V.'s compliance therewith, as represented by the Letter of Undertaking.

- 25 -

137. Defendant intentionally interfered with the Shareholder's Agreement by directing Air Products B.V. to solicit and participate in the competing projects, including the Aramco Project, without obtaining the prior written consent of AHWAS or AHG, in violation of the Non-Compete.

138. Defendant's actions were willful, wanton, and in reckless disregard of AHWAS' rights, entitling AHWAS to an award of damages, including punitive damages, in an amount to be determined at trial.

## COUNT III

### Derivative Claim on Behalf of AHWAS for Tortious Interference with AHWAS' Relationship with Saudi Aramco

139. Plaintiffs incorporate all prior paragraphs herein by reference as if each of the allegations were fully set forth herein.

140. As stated herein, The Abdullah Hashim Group, including AHG and AHWAS, has a decades-long established history of engaging in industrial gases project work with Saudi Aramco.

141. Saudi Aramco has been historically, and remains, AHG's largest customer.

142. Both Defendant and Air Products B.V. are, and at all times relevant were, aware of AHWAS and AHG's historical business relationship with Saudi Aramco.

143. Furthermore, by virtue of the Non-Compete provision in the Shareholders' Agreement, AHWAS has a right to participate in any projects that are similar to the business of AHG, including the Aramco Project.

144. Defendant is aware of AHWAS' contractual right, and is in "full control" of Air Products B.V.'s compliance therewith, as represented by the Letter of Undertaking.

145.    Defendant intentionally interfered with AHWAS' prospective contractual relationship with Saudi Aramco by directing Air Products B.V. to participate in the Aramco Project without prior written consent, in violation of the Non-Compete.

146.    As a result of the interference, AHWAS and AHG were deprived the opportunity to participate in, and – by extension – the profits resulting from, the competing projects, including the Aramco Project.

147.    Defendant's actions were willful, wanton, and in reckless disregard of AHWAS' rights, entitling AHWAS to an award of damages, including punitive damages, in an amount to be determined at trial.

## COUNT IV

### Derivative Claim on Behalf of AHWAS for Conversion/Misappropriation
### (Pennsylvania Law)

148.    Plaintiffs incorporate all prior paragraphs herein by reference as if each of the allegations were fully set forth herein.

149.    Pursuant to the Shareholders' Agreement, AHWAS has a right to participate in any competing projects, including the Aramco Project.

150.    By extension of this right to participate, AHWAS has a property right in the profits arising from any competing projects.

151.    Defendant knowingly directed Air Products B.V. to participate in the competing projects, including the Aramco Project, without obtaining prior written consent from AHG or AHWAS.

152.    In so doing, Defendant knowingly deprived AHWAS of its property right in the profits arising from the competing projects, including the Aramco Project.

153.    Defendant's actions were willful, wanton, and in reckless disregard of AHWAS' rights, entitling AHWAS to an award of damages, including punitive damages in an amount to be determined at trial

## COUNT V

### Derivative Claim on Behalf of AHWAS, and Direct Claim on Behalf of Plaintiffs, for Usurpation (Saudi Law)

154.    Plaintiffs incorporate all prior paragraphs herein by reference as if each of the allegations were fully set forth herein.

155.    Saudi law generally defines usurpation as the exercise of ownership over the property of another nonconsensually and wrongfully.

156.    Pursuant to the Shareholder's Agreement, AHWAS is entitled to participate in any and all projects that Air Products B.V. or its affiliates enter within the Kingdom of Saudi Arabia that are "similar to the industrial and commercial business of the Company."

157.    By entering into competing projects, including the Aramco Project, without obtaining the written consent of AHWAS, Air Products B.V. deprived AHWAS, and by extension, Plaintiffs, of their right of property in the profits resulting from the competing projects.

158.    Defendant, being in "full control" of Air Products B.V. (as represented in the Letter of Undertaking) directed Air Products B.V. to deprive the Plaintiffs of their proportional share of the profits resulting from the competing projects, and/or failed to prevent Air Products B.V. from doing so.

159.    Defendant, as 100% owner of Air Products B.V.'s common stock (as represented in the Letter of Undertaking) has deprived AHWAS, and by extension, Plaintiffs, of their right of property in the profits resulting from the competing projects.

- 28 -

160.    Under the laws of Saudi Arabia, AHWAS is entitled to the return of its wrongfully converted property in the form of its proportional share of the profits resulting from any and all competing projects.  Plaintiffs have standing to assert this claim on behalf of AHWAS.

161.    Likewise, under the laws of Saudi Arabia, Plaintiffs are entitled to the return of their wrongfully converted property in the form of their proportional share of the profits resulting from any and all competing projects.  Plaintiffs have standing to assert this claim in their own right.

## COUNT VI

### Direct Claim For Aiding and Abetting AP Managers' Breach of Fiduciary Duty

162.    Plaintiffs incorporate all prior paragraphs herein by reference as if each of the allegations were fully set forth herein.

163.    By virtue of their position on AHG's Board of Managers, the AP Managers owe fiduciary duties to the Plaintiffs under the laws of Saudi Arabia.

164.    In violation of their duties, the AP Managers solicited and engaged in competing projects, without prior written consent by AHWAS and AHG, in violation of the Non-Compete, and to the detriment of AHG, AHWAS, and their shareholders.

165.    As represented in the Letter of Undertaking, Defendant was aware of Air Products B.V., and the AP Managers' obligations, and was in "full control" of their compliance therewith.

166.    Defendant aided and abetted the AP Managers' violations of their fiduciary duties to Plaintiffs by directing the AP Managers to solicit and participate in competing projects without obtaining prior written consent.

167.     Defendant aided and abetted the AP Managers' violations of their fiduciary duties to Plaintiffs by offering substantial assistance to the AP Managers in soliciting and participating in competing projects without obtaining prior written consent.

168.     Defendant's actions were willful, wanton, and in reckless disregard of Plaintiffs' rights, entitling Plaintiffs to an award of damages, including punitive damages, in an amount to be determined at trial.

### COUNT VII

### Direct Claim For Aiding and Abetting Khalid Hashim's
### Breach of Fiduciary Duty

169.     Plaintiffs incorporate all prior paragraphs herein by reference as if each of the allegations were fully set forth herein.

170.     Khalid Hashim, in his capacity as General Manager of AHWAS, Director of AHG, and majority shareholder of AHWAS, owes fiduciary duties to Plaintiffs as minority shareholders in AHWAS under the laws of the Kingdom of Saudi Arabia.

171.     Khalid Hashim breached his fiduciary duties by pursuing his own interests instead of, and to the detriment of, the interests of AHWAS and its shareholders, including Plaintiffs.

172.     As stated herein, upon information and belief, subsequent to meeting with the AP Managers on or around July 24, 2019, Khalid Hashim abandoned his previous efforts to vindicate AHWAS' contractual rights, and instead pursued his own interests instead of, and to the detriment of, the interests of AHWAS and its shareholders, including Plaintiffs.

173.     Khalid Hashim has refused to provide any information to Plaintiffs regarding his meetings with the AP Managers.

174.    Defendant was aware, or should have been aware, of the duties that Khalid Hashim owes to the shareholders of AHWAS, including Plaintiffs.

175.    Upon information and belief, Defendant aided and abetted Khalid Hashim's violations of his fiduciary duties to AHWAS' shareholders by inducing Khalid Hashim to abandon his previous efforts to vindicate AHWAS' contractual rights, and to instead pursue his own interests instead of, and to the detriment of, the interests of AHWAS and its shareholders, including Plaintiffs.

176.    Defendant's actions were willful, wanton, and in reckless disregard of Plaintiffs' rights, entitling Plaintiffs to an award of damages, including punitive damages, in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment as follows:

A.  An award of damages, in an amount to be determined at trial;

B.  Available attorneys' fees and costs;

C.  Prejudgment interest at the maximum legal rate; and

D.  Other and further relief as the Court deems just and proper.

Dated: February 28, 2020        Respectfully submitted:

By: _____

Tarek F. Abdalla, Bar No. 59924
Andy R. Stanton, Bar No. 93409 (*Pro Hac Vice* Motion to be Filed)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, Pennsylvania 15219
Telephone: (412) 391-3939

## **VERIFICATION**

I, Majed Hashim A Hashim, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February __28__, 2020

_____
Majed Hashim A Hashim

# EXHIBIT 1

UNITED WELDING
& SUPPLIES CO. LTD



DATED

May 29 2012

SHAREHOLDERS' AGREEMENT

Between

UNITED WELDING & SUPPLIES CO. LTD

and

AIR PRODUCTS LEASING B.V.



**AHG**

Abdullah Hashim Industrial
Gases & Equipment Co. Ltd.

UNITED WELDING
& SUPPLIES CO. LTD



This Shareholders' Agreement (the "Agreement") is dated May 29, 2012.

**PARTIES**

(1)   **UNITED WELDING & SUPPLIES CO. LTD** a limited liability company registered in the Kingdom of Saudi Arabia with commercial registration number 4030121304 dated 26/12/1417H (corresponding to 04/05/1997G), whose registered office is at PO Box 44, Madina Road, Jeddah, Kingdom of Saudi Arabia (AHWAS).

(2)   **AIR PRODUCTS LEASING B.V.** incorporated and registered in the Netherlands with company number 29048444 whose registered office is at Kanaalweg 15, 3526 KL, Utrecht, Netherlands (AP).

**BACKGROUND**

(A)   Pursuant to a Share Purchase Agreement dated 12 September 2011, AHWAS acquired 75% and AP acquired 25% of the issued shares in Abdullah Hashim Industrial Gases and Equipment Co. Limited, a limited liability company incorporated in the Kingdom of Saudi Arabia under commercial registration number 4030121304 dated 15/04/1400H (the "Company").

(B)   The Company shall carry on business on the terms and conditions of this Agreement and its Articles of Association.

(C)   AHWAS and AP shall exercise their rights in relation to the Company on the terms and conditions of this Agreement.

(D)   AHWAS and AP desire to set out the rights and obligations among them.

**AGREED TERMS**

**1.**   **INTERPRETATION**

1.1   The definitions and rules of interpretation in this Clause apply in this agreement.

AHWAS Manager: any manager appointed to AHG by AHWAS.

Affiliate: in relation to any Party, any entity which Controls or, is directly or indirectly Controlled by or under common Control with, such Party, provided that the Company shall be deemed not to be an Affiliate of any Party.

AP: Air Products Leasing B.V., a company incorporated and registered in the Netherlands with company number 29048444 whose registered office is at Kanaalweg 15, 3526 Kl Utreicht, Netherlands.

AP Manager: any manager appointed to the Company by AP.

Audited Accounts: shall mean the report and audited accounts of the Company for the financial period ending on the relevant balance sheet date;

Board of Managers: the board of managers of the Company.

Business Day: a day when banks in Saudi Arabia are open for business.

Business Plan: has the meaning given in Clause 6.

1

UNITED WELDING
& SUPPLIES CO. LTD



**Company:** Abdullah Hashim Industrial Gases and Equipment Co. Limited, a limited liability company incorporated in the Kingdom of Saudi Arabia under commercial registration number 4030023276 dated 15/4/1400H (corresponding to 2/3/1980G).

**Control:** in relation to any person (the "First Person"), the right of another person or persons acting together, whether in law or in fact, to secure by means of the holding of a number of shares bearing more than 50% of the voting rights attaching to all the shares in the First Person, or by having the power to control the composition of the board of directors or other governing body of the First Person, that all or a substantial proportion of the affairs of the First Person are conducted in accordance with the wishes of that person or persons and the expressions "Controls" or "Controlled" shall be construed accordingly.

**Confidential Information:** has the meaning given in Clause 13.

**Continuing Partner:** has the meaning given in Clause 10.6.

**DZIT:** the Department of Zakat and Income Tax of the Kingdom of Saudi Arabia.

**Group:** in relation to a company (wherever incorporated), that company, any company of which it is a Subsidiary (its holding company) and any other Subsidiaries of any such holding company; and each company in a Group is a member of the Group.

Unless the context otherwise requires, the application of the definition of Group to any company at any time shall apply to the company as it is at that time.

**Manager:** a member of the Board of Managers

**Partners:** means AHWAS and AP.

**Saudi Arabian Accounting Standards:** Saudi shall mean accounting standards which are in compliance with regulations and standards promulgated by the Saudi Arabian Ministry of Commerce and Industry and the Saudi Organization for Certified Public Accountants and where no such standards are established.

**Tag-Along Exercise Period:** shall have the meaning set forth in Clause 10.10.

**Tag-Along Notice:** shall have the meaning set forth in Clause 10.10.

**Tag-Along Option:** shall have the meaning set forth in Clause 10.10.

**Transfer Notice:** has the meaning given in Clause 10.6.

2.    **THE BUSINESS OF THE COMPANY**

2.1    The business of the Company is to engage in the manufacturing and trading of industrial gases and equipment in accordance with its objects as set out in its Articles of Association from time to time. Each party shall use its reasonable endeavours to promote and develop the business of the Company to the best advantage of the Company.

2.2    The name of the Company is Abdullah Hashim Industrial Gases and Equipment Co. Limited.

3.    **MANAGERS AND MANAGEMENT**

3.1    The Partners have agreed to form a board hereinafter referred to as the "Board of Managers",

2

UNITED WELDING
& SUPPLIES CO. LTD

AIR
PRODUCTS 

3.2     The Board of Managers of the Company has responsibility for the supervision and management of the Company and its business in accordance with the provisions of the Company's Articles of Association and this Agreement.

3.3     The Company shall be managed by a Board of Managers composed of eight (8) managers, six (6) of whom shall be appointed by AHWAS and the remaining two (2) shall be appointed by AP. All appointments of Managers shall be effected by written notice to the Company and the other party.

3.4     The party who appointed a Manager may remove that Manager at any time by giving written notice to the Company and the other party, without prejudice to that Manager's right to compensation if the removal is without legal cause or at an improper time.

3.5     The party removing a Manager shall indemnify and keep indemnified the Company against any claim connected with the Manager's removal from office.

3.6     The parties intend there to be a meeting of the Board of Managers at least two times a year which meeting venue shall be the Company's headquarters in Saudi Arabia or as otherwise agreed by a majority of the Managers.

3.7     Meetings of the Board of Managers shall be held at such times as any four (4) Managers of the Board of Managers and/or any partner may require upon written notice to the Managers of the Board. The Board of Managers may waive these requirements for notice by a unanimous vote at the beginning of the meeting and before any other business is transacted.

3.8     The parties shall ensure that at least thirty (30) days' notice of a meeting of the Board of Managers is given to all managers entitled to receive notice accompanied by:

(a)     an agenda specifying in reasonable detail the matters to be raised at the meeting; and

(b)     copies of any papers to be discussed at the meeting.

3.9     The Board of Managers may waive these requirements for notice by a unanimous vote at the beginning of the meeting and before any other business is transacted.

3.10    Matters not on the agenda, or business conducted in relation to those matters, may not be raised at a meeting of the Board of Managers unless all the Managers agree in writing.

3.11    The presence of four (4) Managers of the Board of Managers in person or by proxy with one (1) Manager at least representing each shareholder shall be necessary to constitute a valid quorum. If, however, a quorum is not obtained for a validly called meeting then the meeting shall be postponed for seven (7) days and shall be held at the same time and place as the originally scheduled meeting. The quorum for the postponed meeting shall consist of any four (4) Managers.

3.12    No business shall be conducted at any meeting of the Board of Managers unless a quorum is present at the beginning of the meeting and at the time when there is to be voting on any business.

3.13    If a quorum is not present within 120 minutes after the time specified for a Board of Managers' meeting in the notice of the meeting then it shall be adjourned for seven (7) Business Days at the same time and place.

3.14    Meetings of the Board of Managers shall make decisions by passing resolutions. A resolution must be passed by decision of the majority of the Managers present provided however that a

3

UNITED WELDING
& SUPPLIES CO. LTD



resolution to acquire the shares of another company shall require the consent of the majority of the Managers of the Board of Managers present including at least one AP Manager.

3.15    At a meeting of the Board of Managers, each Manager has one vote.

3.16    An AHWAS Manager or an AP Manager absent from a meeting may appoint any person to act as his alternate at the meeting. For the purposes of the meeting the alternate Manager:

(a)    shall be the AHWAS Manager or AP Manager by whom he is appointed and may vote in place of the AHWAS Manager or AP Manager; and

(b)    where the person appointed as an alternate is already a Manager of the Company in his own right, shall also be a Manager (and may vote) in his own right.

3.17    The Board of Managers shall appoint an Operations Committee comprising of four individuals. Each party shall nominate two individuals who have backgrounds in commercial and/or operations. The Operations Committee shall be chaired by the Company's Executive Manager and advise the Board of Managers on issues related to operations, commercial, maintenance and technical matters. For the avoidance of doubt, the Operations Committee shall have no executive powers.

3.18    The Operations Committee shall meet quarterly. Decisions by the Operations Committee shall be by majority vote of all its members in attendance (a quorum requiring at least two members in attendance, one being the nominee of each party. Without prejudice to the authority of the Board of Managers who may accept or reject any decision at its entire discretion, the parties agree that the decisions of the Operations Committee shall be seriously considered, not lightly overruled and with the decision making criteria fully communicated by the Board of Managers. The Operations Committee shall be subordinate and ultimately responsible to the Board.

3.19    The Board of Managers may appoint from time to time other committees that will be composed of persons representing the two parties and may delegate to these committees authorities and powers as the Board may deem appropriate. All committees of the Board shall be subordinate and ultimately responsible to the Board.

4.    DAY TO DAY MANAGEMENT OF THE COMPANY

4.1    The Board shall appoint an Executive Manager who will be responsible for the day to day operation of the Company.

4.2    The parties agree that the Company shall apply and operate in accordance with the environmental, health and safety policies and procedures of the AP Group and all legal requirements as are in force from time to time in the Kingdom of Saudi Arabia.

5.    FINANCE FOR THE COMPANY

5.1    The parties envisage that the Company shall be financed through a combination of debt and equity.

5.2    If the Partners resolve that the Company requires further funding or other credit requirements beyond the share capital (including but not limited to bank guarantee, foreign exchange facilities or overdraft) and the Partners agree to provide such funding, the Partners agree with each other to advance such funding each in proportion to its shareholding and under substantially similar terms acceptable to both parties. If the Partners resolve that the Company shall obtain third party financing and the Partners agree to provide support for such

4

UNITED WELDING
& SUPPLIES CO. LTD



financing, the Partners agree to provide such support and any necessary guarantees each in proportion to its shareholding and under substantially similar terms acceptable to both parties. If joint and several guarantees are required by any credit provider and the Partners agree to provide such guarantees, each Partner agrees to indemnify the other in the event that a call is made under such guarantee on either party in excess of that party's proportionate share of the guarantee. The parties agree that they may charge a fee on an arm's length basis to the Company in respect of the provision of any guarantee.

5.3   Notwithstanding the foregoing, the Parties hereby agree, acknowledge and confirm that no Party is under the obligation to extend or provide to the Company any loans, guarantees or other financial assistance of any kind, unless otherwise agreed by that Party or required by applicable law. Nothing in this Agreement shall be construed to require any Party to assume or otherwise incur any obligations of the Company or another Party, unless otherwise expressly provided elsewhere in this Agreement.

**6.   THE BUSINESS PLAN**

6.1   The Business Plan is an annual business plan which shall be approved by the Board of Managers. It shall include in relation to the Financial Year to which it relates:

    (a)   a cash flow statement giving, among other details:

        (i)   an estimate of the working capital requirements, other capital investments, debt service requirements; and

        (ii)   an indication of the amount (if any) that it is considered prudent to retain, for the purpose of meeting those requirements, out of those profits of the previous Financial Year that are available for distribution to Partner;

    (b)   a monthly projected profit and loss account;

    (c)   an operating budget and balance sheet forecast;

    (d)   a management report giving business objectives for the year;

    (e)   a financial report which shall include an analysis of the results of the Company for the previous Financial Year compared with the Business Plan for that year, identifying variations in sales revenues, costs and other material items; and

    (f)   a quarterly forecast of the performance of the Company for the fiscal year.

6.2   The Business Plan for each Financial Year following the 2012 Financial Year shall be:

    (a)   prepared at least 45 days before the end of the preceding Financial Year (the first day being the first day of the Financial Year to which the plan relates); and

    (b)   adopted and approved by the Board of Managers as soon as possible after it has been prepared.

**7.   ACCOUNTING, ADMINISTRATION AND COMPLIANCE WITH STANDARDS**

7.1   The Company shall at all times maintain accurate and complete accounting and other financial records in accordance with Saudi Arabian Accounting Standards.



UNITED WELDING
& SUPPLIES CO. LTD



7.2   Each party and its authorised representatives shall be allowed access at all reasonable times to examine the books and records of the Company, including regular internal audit reviews as required by the governance principles of the parties.

7.3   The Company shall supply each party with the financial information necessary to keep the party informed about how effectively the business of the Company is performing and in particular shall supply each party with:

(a)   a copy of the Audited Accounts prepared in accordance with the Saudi Arabian Accounting Standards, within three (3) months of the end of the year to which the audited accounts relate;

(b)   monthly management accounts of the Company to be supplied within 10 business days of the end of the month to which they relate (the first day being the first day of the following month) and the accounts shall include a profit and loss account, variance analysis of the month's operating performance versus business plan for that month and a sales, cost of sales and gross profit by product/brand analysis; and

(c)   quarterly management accounts of the Company to be supplied within 10 business days of the end of the quarter to which they relate (the first day being the first day of the following quarter) and the accounts shall include a profit and loss account, variance analysis of the quarter's operating performance versus business plan for that quarter, a balance sheet and a cash flow statement.

7.4   The financial year of the company shall be a period of twelve months commencing on 1 January and ending on 31 December.

7.5   Each of AP and AHWAS agrees that it will comply with all applicable laws.   Without limiting the foregoing, each of AP and AHWAS, represents and warrants that:

(a)   It has not paid or offered to pay money, or given or offered to give anything of value directly or indirectly to any representative or employee of any government or to any public official and will not do so in the future; and

(b)   It has not made such payment or given such item of value knowing that a portion thereof may be offered, given or promised directly or indirectly to any representative or employee of any government or to any public official and will not do so in the future.

8.   DIVIDEND POLICY

8.1   The annual net profits of the Company, after deduction of depreciation, operating expenses and general expenses, shall be distributed as follows::

(a)   the Company shall set aside ten percent (10%) of such profits to constitute the statutory reserve required by Article 176 of the Companies Law.  The Company may cease setting aside this reserve when it reaches fifty percent (50%) of the share capital of the Company; and

(b)   The remaining balance of the profits shall be distributed among the Shareholders pro rata according to the percentage of the shares owned by each shareholder, unless it is decided by the Partners to set aside other reserves or bring forward the balance of profits, totally or partially, to next financial year.

UNITED WELDING
& SUPPLIES CO. LTD



8.2    If losses are incurred, they shall be carried over to the next Fiscal Year and noprofits shall be distributed until the losses are fully covered.

9.    **TAX MATTERS**

9.1    Each Partner shall be solely responsible for any zakat or Saudi Arabian income tax (including withholding tax) which is imposed by applicable Saudi Arabian tax laws and by-laws on:

     (a)    its respective share of the Company's profits or dividends; or

     (b)    its respective ownership interest in the Company.

9.2    Each Partner shall authorize the Company to pay to the DZIT on its behalf the Saudi Arabian income tax or zakat for which it is responsible pursuant to Clause 9.1 and charge a corresponding amount to retained earnings for the account of such Partner in accordance with the applicable Saudi Arabian Accounting Standards.

9.3    If at any time additional amounts are required from a Partner to cover any income tax or zakat for which it is responsible pursuant to Clause 9.2, the Company shall charge such additional amounts to the statement of retained earnings of that Partner and shall be responsible to pay such amounts charged to retained earnings to the DZIT.

9.4    Each party authorizes the Company to deduct from any payment from the Company to it any Saudi Arabian withholding tax imposed on such payment and to pay such amount to the relevant tax authority.

9.5    The parties hereby authorize each other to file information based on the annual financial statements of the Company with their respective government authorities, provided that such filing shall not cause the Company to incur any additional liability.

9.6    The Company shall provide either Partner with any information that it may reasonably request to satisfy its legal compliance requirements. If the Company incurs third party costs to prepare such information, the requesting party shall bear such costs.

10.    **TRANSFER OF SHARES**

10.1    No party shall transfer, grant any security interest over, or otherwise dispose of or give any person any rights in or over any share or interest in any share in the Company unless it is permitted or required under this Agreement.

10.2    A party may do anything prohibited by this Clause if the other party has given its prior written consent.

10.3    A party may transfer all or part of its shares (Offered Shares) in the Company to a wholly owned member of its Group or to its legal successors subject to giving prior written notice to the other party and complying with the Saudi legal requirements without following the steps in this Clause if at the time of the transfer and in relation to the Offered Shares, the transferring party:

     (a)    procures that the transferee enters into a partners' agreement with the remaining party to this Agreement on the same terms as apply to the transferring party in relation to the Offered Shares immediately before the transfer; and

     (b)    guarantees all the obligations and any liability of the transferee under that Agreement.

7

UNITED WELDING
& SUPPLIES CO. LTD



10.4    No party may transfer any of its shares in the Company to a competitor.

10.5    Subject to Clause 10.4, a party may transfer all or part of its shares in the Company to a third party for cash and not on deferred terms if the party follows the steps in Clauses 10.6 – 10.12.

10.6    The party (Seller) wishing to transfer part all or part of its shares (the Offered Shares) shall give an irrevocable notice (Transfer Notice) to the other partner (Continuing Partner) of the details of the proposed transfer including, in particular, the identity of the buyer and the price of the Offered Shares.

10.7    If the Continuing Partner gives notice to the Seller within eighty (80) calendar days of receiving the Transfer Notice (the first day being the day after it receives the Transfer Notice) that it wishes to buy all, but not a part, of the Offered Shares, the Continuing Partner shall have the right to do so at the price specified in the Transfer Notice and such sale of shares shall be completed within three (3) months.

10.8    The Continuing Partner is bound to buy all, but not a part, of the Offered Shares when it gives notice to the Seller under Clause 10.7 that it wishes to do so. The sale and purchase of the Offered Shares shall take place on the terms set out in Clause 10.6.

10.9    If at the expiry of the period specified in Clause 10.7, the Continuing Partner has not notified the Seller that it wants to buy the Offered Shares, the Seller may transfer all, but not a part, of its shares in the Company to the buyer identified in the Transfer Notice at a price not less than the price specified in that notice provided that it does so within three (3) months of the expiry of the period specified in Clause 10.7.

10.10   If the party that has issued the Transfer Notice pursuant to Clause 10.5 for the sale of all, but not part of, its shares in the Company is AHWAS, AP may, without prejudice to its rights under the provisions of Clause 10.7, exercise an option (the "Tag-Along Option") to have all the shares then owned by it included in the sale contemplated in the Transfer Notice, by giving a written notice (the "Tag-Along Notice") to AHWAS of its decision to exercise the Tag-Along Option within thirty (30) days from its receipt of the relevant Transfer Notice (the "Tag-Along Exercise Period"). The Tag-Along Notice shall be irrevocable. Upon receipt by AHWAS of a valid Tag-Along Notice, AHWAS shall not transfer any of its shares unless the transferee purchases AP's shares that are covered by the Tag-Along Option exercised in accordance with the provisions of this Clause 10.10 for the same price and in accordance with the same terms and conditions.

10.11   Each party undertakes (in respect of the shares that it holds) to give, and to use its reasonable efforts to procure that Partners in its Group give, the approvals required for the transfer of the Offered Shares under this Clause.

10.12   The Seller shall procure that, in relation to the Offered Shares, any buyer of the shares who is not already one of the Partners and therefore a party to this Agreement, shall enter into a partners' agreement at completion with the Continuing Partner on the same terms as apply to the Seller in relation to the Offered Shares before completion. Any such sale shall be conditional upon entering into the partners' agreement.

10.13   The non-Saudi party that sells shares in the Company shall be responsible to settle gain tax, if any, including any income tax in accordance with the Saudi Arabian tax laws to the DZIT though the Company.

10.14   References in this Clause to shares held by a party in the Company are to all the shares in the Company held by that party or any member of its Group and not to some only of those shares,

UNITED WELDING
& SUPPLIES CO. LTD



## 11. TERMINATION AND LIQUIDATION

11.1 Except for the provisions which this Clause states shall continue in full force after termination, this Agreement shall terminate:

(a) when one party ceases to hold any shares in the Company; or

(b) when a resolution is passed by the partners or creditors, or an order made by a court or other competent body or person instituting a process that shall lead to the Company being wound up and its assets being distributed among the Company 's creditors, partners or other contributors.

11.2 The following provisions of this Agreement remain in full force after termination:

(a) Clause 1 (interpretation);

(b) Clause 9 (tax matters);

(c) Clause 11 (Termination and Liquidation);

(d) Clause 13 (confidentiality);

(e) Clause 14 (whole agreement);

(f) Clause 16 (variation and waiver);

(g) Clause 17 (costs);

(h) Clause 19 (notice);

(i) Clause 20 (severance); and

(j) Clause 21 (governing law and jurisdiction).

11.3 Termination of this Agreement shall not affect any rights or liabilities that the parties have accrued under it.

11.4 If this Agreement terminates each party shall, if requested by the other, procure that the name of the Company is changed to avoid confusion with the name of the party making the request.

11.5 Where the Company is to be wound up and its assets distributed, the parties shall agree a suitable basis for dealing with the interests and assets of the Company and shall endeavour to ensure that:

(a) all existing contracts of the Company are performed to the extent that there are sufficient resources;

(b) the Company shall not enter into any new contractual obligations;

(c) the Company is dissolved and its assets are distributed as soon as practical; and

(d) any other proprietary information or intellectual property rights belonging to or originating from a party shall be returned to it by the other party or the Company.

UNITED WELDING
& SUPPLIES CO. LTD



12.   **STATUS OF AGREEMENT**

12.1   Each party shall, to the extent that it is able to do so, exercise all its voting rights and other powers in relation to the Company to procure that the provisions of this Agreement are promptly observed and given full force and effect according to the spirit and intention of the Agreement.

12.2   The parties shall, when necessary, exercise their powers of voting and any other rights and powers they have to amend, waive or suspend a conflicting provision in the Articles of Association to the extent necessary to permit the Company and its business to be administered as provided in this Agreement.

13.   **CONFIDENTIALITY**

13.1   In this Clause Confidential Information means any information:

   (a)   which either party may have or acquire (whether before or after the date of this Agreement) in relation to the customers, business, assets or affairs of the Company (including, without limitation, any information provided pursuant to Clause 7);

   (b)   which either party or any member of its Group may have or acquire (whether before or after the date of this Agreement) in relation to the customers, business, assets or affairs of the other party or any member of the other party's Group, as a consequence of the negotiations relating to this Agreement or the performance of the Agreement; or

   (c)   which relates to the contents of this Agreement (or any agreement or arrangement entered into pursuant to this Agreement),

   but excludes the information in Clause 13.2.

13.2   Information is not Confidential Information if:

   (a)   it is or becomes public knowledge other than as a direct or indirect result of the information being disclosed in breach of this Agreement;

   (b)   either party can establish to the reasonable satisfaction of the other party that it found out the information from a source not connected with the other party or its Group and that the source is not under any obligation of confidence in respect of the information;

   (c)   either party can establish to the reasonable satisfaction of the other party that the information was known to the first party before the date of this Agreement and that it was not under any obligation of confidence in respect of the information; or

   (d)   the parties agree in writing that it is not confidential.

13.3   Each party shall at all times use all reasonable endeavours to keep confidential (and to ensure that its employees, agents, Subsidiaries and the employees and agents of such Subsidiaries, and the Company (in respect of information specified in Clause 13.1(b) and Clause 13.1(c)) shall keep confidential) any Confidential Information and shall not use or disclose any such Confidential Information except:

   (a)   to another member of the AHWAS Group or AP Group, as the case may be, or to a party's professional advisers where such disclosure is for a purpose related to the operation of this agreement;

10

UNITED WELDING
& SUPPLIES CO. LTD



(b)   with the written consent of such of the Company or the party or any member of its Group that the information relates to;

(c)   as may be required by law or by the rules of any recognised stock exchange, or governmental or other regulatory body, when the party concerned shall, if practicable, supply a copy of the required disclosure to the other before it is disclosed and incorporate any amendments or additions reasonably required by the other;

(d)   to any tax authority to the extent reasonably required for the purposes of the tax affairs of the party concerned or any member of its Group; or

(e)   if the information comes within the public domain (otherwise than as a result of the breach of this Clause 13.3).

13.4   Upon termination of this Agreement, either party may demand from the other and the Company the return of any documents containing Confidential Information in relation to the first party by notice in writing whereupon the other party shall (and shall use all reasonable endeavours to ensure that its Subsidiaries, and its officers and employees and those of its Subsidiaries and the Company shall):

(a)   return such documents; and

(b)   destroy any copies of such documents and any other document or other record reproducing, containing or made from or with reference to the Confidential Information,

(save, in each case, for any submission to or filings with governmental, tax or regulatory authorities). Such return or destruction shall take place as soon as practicable after the receipt of any such notice.

13.5   The obligations of each of the parties in this Clause 13 shall continue for five years after termination of this agreement for any cause.

14.   **WHOLE AGREEMENT**

14.1   This Agreement, and any documents referred to in it or executed contemporaneously with it, constitute the whole agreement between the parties and supersede any arrangements, understanding or previous agreement between them relating to the subject matter they cover.

14.2   Each party acknowledges that in entering into this Agreement, and any documents referred to in it or executed contemporaneously with it, it does not rely on, and shall have no remedy in respect of, any statement, representation, assurance or warranty of any person other than as expressly set out in this Agreement or those documents.

14.3   Nothing in this Clause operates to limit or exclude any liability for fraud.

15.   **ASSIGNMENTS**

15.1   Except as provided for in Clause 10, no person may assign, or grant any security interest over, any of its rights under this agreement or any document referred to in it without the prior written consent of all the parties.

15.2   Each person that has rights under this Agreement is acting on its own behalf.

UNITED WELDING
& SUPPLIES CO. LTD



**16.    VARIATION AND WAIVER**

16.1    A variation of this Agreement shall be in writing and signed by or on behalf of all parties.

16.2    A waiver of any right under this Agreement is only effective if it is in writing and it applies only to the person to which the waiver is addressed and the circumstances for which it is given.

16.3    A person that waives a right in relation to one person, or takes or fails to take any action against that person, does not affect its rights against any other person.

**17.    COSTS**

Unless otherwise provided, each party shall bear its own costs in connection with the negotiation, preparation, execution and performance of this Agreement.

**18.    THIRD PARTY RIGHTS**

18.1    This Agreement is made for the benefit of the parties and their successors and permitted assigns and is not intended to benefit or be enforceable by anyone else.

18.2    The right of the parties to terminate, rescind or agree any amendment, variation, waiver or settlement under this Agreement is not subject to the consent of any person that is not a party to the Agreement.

**19.    NOTICE**

19.1    A notice given under this Agreement:

(a)    shall be in writing in the English language (or be accompanied by an accurate translation into English);

(b)    shall be sent for the attention of the person, and to the address, or fax number, given in this Clause (or such other address, fax number or person as the party may notify to the others, such notice to take effect from the date the notice being received); and

(c)    shall be:

(i)    delivered personally;

(ii)    sent by fax;

(iii)    sent by international or express courier.

19.2    The addresses for service of notice are:

(a)    Air Product Leasing BV

Address:

European Law Group
Hersham Place
Molesey road
Walton on Thames KT12 4RZ
United Kingdom

12

UNITED WELDING  
& SUPPLIES CO. LTD



   For the attention of: Legal Counsel – Middle East  
   Telephone number: 00 44 1932249807  
   Fax number: 00 44 1932258594  

 (b)  United Welding & Supplies Co. Ltd

   Address:

   Po Box 595  
   Jeddah 21421  
   Kingdom of Saudi Arabia  
   For the attention of: Managing Director  
   Telephone number: +966-2-662 1500  
   Fax number: +966-2-662 2425  

19.3 A notice is deemed to have been received:

 (a)  if delivered personally, at the time of delivery;

 (b)  in the case of fax, at the time of transmission; or

 (c)  in the case of international or express courier, at the time of delivery;

 (d)  if deemed receipt under the previous paragraphs of this sub-clause is not within business hours (meaning 9.00 am to 5.30 pm on a day that is a Business Day in the place of receipt), when business next starts in the place of receipt.

19.4 To prove service it is sufficient to prove that the notice was transmitted by fax to the fax number of the party or, in the case of post, that the envelope containing the notice was properly addressed and received/delivered.

## 20. SEVERANCE

20.1 If any provision of this Agreement (or part of a provision) is found by any court or administrative body of competent jurisdiction to be invalid, unenforceable or illegal, the other provisions shall remain in force.

20.2 If any invalid, unenforceable or illegal provision would be valid, enforceable or legal if some part of it were deleted or modified, the provision shall apply with whatever modification is necessary to give effect to the commercial intention of the parties.

## 21. GOVERNING LAW AND JURISDICTION

21.1 This Agreement and any disputes or claims arising out of or in connection with its subject matter are governed by and construed in accordance with the law of Saudi Arabia.

21.2 The Partners shall endeavour to settle all matters arising under this Agreement amicably, but all disputes arising in connection with this Agreement not settled amicably within a reasonable period shall be finally resolved by the competent courts of Saudi Arabia.

## 22. NON-COMPETE

22.1 As long as Partner is a Partner in the Company and for three (3) years thereafter, the Partners undertake to cooperate together in the interests of the Company and they agree that none of the Partners will participate, directly or indirectly, in any other business in Saudi Arabia that is similar to the industrial and commercial business of the Company as described in the Company's Articles of Association as at the date of this Agreement, an extract of which is

UNITED WELDING
& SUPPLIES CO. LTD



attached at Appendix 1. In particular, subject to Clause 22.2 below, neither Partner shall, and each Partner shall procure that none of its Affiliates will, as long as it is a Partner in the Company and for three (3) years thereafter, engage, directly or indirectly, in any activities that compete or conflict with the business of the Company in Saudi Arabia including, but not limited to, the following, without the prior written consent of the other Partner:

(a)   providing any product or service, where a material component of such product or service competes or conflicts with the business of the Company;

(b)   participating (whether as shareholder, partner or otherwise and whether directly or indirectly) in any project, business or activity where a material component of such project, business or activity competes or conflicts with the business of the Company;

(c)   either on its own account or in conjunction with or on behalf of any other person, employing, soliciting or enticing away or attempting to employ, solicit or entice away from the Company any person who is an officer, manager, consultant or employee of the Company or an employee of any Party seconded to the Company whether or not such person would commit a breach of contract by reason of leaving such employment without the prior written agreement of the Parties; or

(d)   either on its own account or in conjunction with or on behalf of any other person, soliciting or enticing away or attempting to solicit or entice away from the Company any person who is a customer, client, prospective customer or client, agent or correspondent of the Company.

22.2   The restrictions set forth in Clause 22.1 shall not apply to:

(a)   The business conducted by Air Products Yanbu Limited's branch in Saudi Arabia prior to the date of this Agreement pursuant to foreign investment license No. (820/1) dated 21/10/1424H, in such form, size, and magnitude as currently conducted as at the date of this Agreement;

(b)   Any services contract related to AP's customer plant support division, provided that such contract shall have an aggregate value of not less than 10% of the Company's annual turnover for the immediately preceding year;

(c)   any large air separation or large hydrogen project undertaken by AP or its Affiliates provided however that such project shall have a value of not less than three times the Company's annual turnover for the immediately preceding year and that AP shall give the Company, AHWAS and/or any of their Affiliates a right of first refusal to participate in the entity undertaking the project in such proportion as may be mutually agreed between the parties;

(d)   any project that the Company does not qualify for, provided however that, subject to the bid requirement, AP shall give the Company, and/or AHWAS or its affiliates a right of first refusal to participate in the entity undertaking the project;

22.3   The Company will grant AP the status of preferred supplier for machinery, equipment and products that it needs to purchase from third parties provided that AP offers terms that are competitive and in accordance with the then prevailing market conditions.

14.

UNITED WELDING
& SUPPLIES CO. LTD

**AIR PRODUCTS**

This agreement has been entered into on the date stated at the beginning of it

Signed by Khalid Hashim

Director

For and on behalf of
UNITED WELDING & SUPPLIES CO. LTD

Signed by Howard Castle-Smith

Director

For and on behalf of
AIR PRODUCTS LEASING B.V

15

# EXHIBIT 2



اتفاقيّة السرية
و أ نموذج AP

Air Products and Chemicals, Inc.
7201 Hamilton Boulevard
Allentown, PA. 18195-1501
Telephone (610) 481-4911

## LETTER OF UNDERTAKING

9 May 2012

To:  UNITED WELDING & SUPPLIES CO. LTD (AHWAS)

Address: PO Box 44, Madina Road, Jeddah, Kingdom of Saudi Arabia

Gentlemen:

Air Products and Chemicals, Inc. ("APCI"), hereby confirms to you as of the date hereof the following:

1.  APCI is aware of a Shareholders' Agreement dated  29 MAY  2012 that you have entered into with Air Products Leasing B.V.

2.  APCI directly or indirectly owns 100% of the outstanding common stock of Air Products Leasing B.V. APCI is not taking or planning on taking any action to reduce its direct or indirect ownership interest in or full control of Air Products Leasing B.V. and APCI shall, at all times, ensure that Air Products Leasing B.V., or any transferee of Air Products Leasing B.V., remains, directly or indirectly, a wholly owned subsidiary of APCI and under its full control.

3.  APCI shall procure that Air Products Leasing B.V., conducts its business in such a way as to be able to meet its obligations under the said Shareholders' Agreement and, in particular, comply with the non-compete provisions therein.

4.  This undertaking shall be governed by the laws of the State of Commonwealth of Pennsylvania and disputes thereunder shall be referred to the courts of the State of Commonwealth of Pennsylvania for resolution.

Very truly yours,
AIR PRODUCTS AND CHEMICALS, INC.

Name: Jeffry Byrne
Title: Vice President, Tonnage Gases

# EXHIBIT 3



 **AHG.** شركة عبدالله هاشم للمعدات والغازات الصناعية المحدودة
Abdullah Hashim Industrial Gases & Equipment Co. Ltd,

| | |
|---|---|
| AMENDED ARTICLES OF ASSOCIATION OF | عقد تأسيس معدل |
| Abdullah Hashim Industrial Gases & Equipment Co. Ltd | لشركة عبدالله هاشم للمعدات والغازات الصناعية المحدودة |
| (A Limited Liability Company) | (شركة ذات مسؤولية محدودة) |
| Dated 16/06/1433H corresponding to 7/05/2012G | تاريخ ١٤٣٣/٠٦/١٦هـ، الموافق ٢٠١٢/٠٥/٧م |

إن الأطراف التالية:

Whereas, the following parties;

Mr. Mohammed Abdullah Hashim, a Saudi national holding ID number 1000646669;

١. السيد/ محمد بن عبدالله بن هاشم هاشم، سعودي الجنسية، بموجب سجل مدني رقم ١٠٠٠٦٤٦٦٦٩؛

("First Party")

("الطرف الأول")

Mr. Hashim Abdullah Hashim, a Saudi national holding ID number 1005701477;

٢. السيد/ هاشم عبدالله هاشم، سعودي الجنسية، بموجب سجل مدني رقم ١٠٠٥٧٠١٤٧٧؛

("Second Party")

("الطرف الثاني")

Mr. Khalid Abdullah Hashim, a Saudi national holding ID number 1001642865;

٣. السيد/ خالد عبدالله هاشم هاشم، سعودي الجنسية، بموجب سجل مدني رقم ١٠٠١٦٤٢٨٦٥؛

("Third Party")

("الطرف الثالث")

Mrs. Jihane Maarouf Saeed Sabouneh, a Saudi national holding ID number 1001642857;

٤. السيدة/ جيهان بنت معروف سعيد صابونه، سعودية الجنسية، بموجب سجل مدني رقم ١٠٠١٦٤٢٨٥٧؛

("Fourth Party")

("الطرف الرابع")

Ms. Imane Abdullah Hashim, a Saudi national holding ID number 1001741469;

٥. السيدة/ أيمان عبدالله هاشم هاشم، سعودية الجنسية، بموجب سجل مدني رقم ١٠٠١٧٤١٤٦٩؛

("Fifth Party")

("الطرف الخامس")

are the only shareholders in Abdullah Hashim Industrial Gases & Equipment Co. Ltd, a Saudi Arabian limited liability company with commercial registration number 4030023276 issued in Jeddah on 15/04/1400H (the "Company"), and whose

هم الشركاء الوحيدون في شركة عبدالله هاشم للمعدات والغازات الصناعية المحدودة، وهي شركة سعودية ذات مسؤولية محدودة بموجب شهادة سجل تجاري رقم ٤٠٣٠٠٢٣٢٧٦ صادرة من جدة بتاريخ

 

Head Office: P.O. Box 699 Jeddah 21421 Tel.: 662-1600 Fax 662-2425 Telex 607465 HASHIM SJ - C.C.J 4094 C.H. 4030023276 Capital SR 47,000,000 Fully Paid

**AHG.**   شركة عبدالله هاشم للمعدات والغازات الصناعية المحدودة
Abdullah Hashim Industrial Gases & Equipment Co., Ltd.

Articles of Association are recorded with the Notary Public in Dammam under No. 490/2 page 2/3 with companies register for the year 1413H and the last amendment thereto was signed before the Notary Public at the Chamber of Commerce in Jeddah under number 35, on page 36 of volume No. 32/CH/M on 15/09/1429H.

Whereas the First Party has decided to withdraw from the Company by selling eight thousand eight hundred and twelve (8,812) shares in the Company with a nominal value of eight million eight hundred and twelve thousand (8,812,000) Saudi Riyals to United Welding & Supplies Co. Ltd. and by selling the remaining two thousand nine hundred and thirty eight (2,938) shares with a nominal value of two million nine hundred and thirty eight thousand (2,938,000) Saudi Riyals to Air Products Leasing B.V.;

Whereas the Second Party has decided to withdraw from the Company by selling eight thousand eight hundred and twelve (8,812) shares in the Company with a nominal value of eight million eight hundred and twelve thousand (8,812,000) Saudi Riyals to United Welding & Supplies Co. Ltd. and by selling the remaining two thousand nine hundred and thirty eight (2,938) shares with a nominal value of two million nine hundred and thirty eight thousand (2,938,000) Saudi Riyals to Air Products Leasing B.V.;

Whereas the Third Party has decided to withdraw from the Company by selling eight thousand eight hundred and twelve (8,812) shares in the Company with a nominal value of eight million eight hundred and twelve thousand (8,812,000) Saudi Riyals to United Welding & Supplies Co. Ltd. and by selling the remaining two thousand nine hundred and thirty eight (2,938) shares with a nominal value of two million nine hundred and thirty eight thousand (2,938,000) Saudi Riyals to Air Products Leasing B.V.;

Whereas the Fourth Party has decided to withdraw from the Company by selling four thousand four hundred and seven (4,407) shares in the Company with a nominal value of four million four hundred and seven thousand (4,407,000) Saudi

١٤٠٠/٠٤/١٥هـ ("الشركة") والمثبت عقد تأسيسها لدى فضيلة كاتب عدل الدمام برقم ٢/٤٩٠ صحيفة ٢/٣ بسجل عقود الشركات لعام ١٤١٣هـ والمثبت آخر قرار تعديل له لدى فضيلة كاتب العدل بالغرفة التجارية بجدة برقم ٣٥ وصحيفة ٣٦ من المجلد ٣٢/ش/م/ في ١٤٢٩/٩/١٥هـ.

حيث أن الطرف الأول قرر الانسحاب من الشركة ببيع ثمانية آلاف وثمانمائة واثني عشرة (٨,٨١٢) حصة من حصصه في الشركة والبالغة قيمتها الاسمية ثمانية ملايين وثمانمائة واثني عشرة ألف (٨,٨١٢,٠٠٠) ريال سعودي لمصلحة الشركة المتحدة لمعدات اللحام والتوريدات المحدودة، ومن خلال بيع حصصه المتبقية البالغة ألفي وتسعمائة وثمانية وثلاثون (٢,٩٣٨) حصة والبالغة قيمتها الاسمية مليونين وتسعمائة وثمانية وثلاثون ألف (٢,٩٣٨,٠٠٠) ريال سعودي لشركة اير برودكتس ليسينج بي.في.؛

حيث أن الطرف الثاني قرر الانسحاب من الشركة ببيع ثمانية آلاف وثمانمائة واثني عشرة (٨,٨١٢) حصة من حصصه في الشركة والبالغة قيمتها الاسمية ثمانية ملايين وثمانمائة واثني عشرة ألف (٨,٨١٢,٠٠٠) ريال سعودي لمصلحة الشركة المتحدة لمعدات اللحام والتوريدات المحدودة، ومن خلال بيع حصصه المتبقية البالغة ألفي وتسعمائة وثمانية وثلاثون (٢,٩٣٨) حصة والبالغة قيمتها الاسمية مليونين وتسعمائة وثمانية وثلاثون ألف (٢,٩٣٨,٠٠٠) ريال سعودي لشركة اير برودكتس ليسينج بي.في.؛

حيث أن الطرف الثالث قرر الانسحاب من الشركة ببيع ثمانية آلاف وثمانمائة واثني عشرة (٨,٨١٢) حصة من حصصه في الشركة والبالغة قيمتها الاسمية ثمانية ملايين وثمانمائة واثني عشرة ألف (٨,٨١٢,٠٠٠) ريال سعودي لمصلحة الشركة المتحدة لمعدات اللحام والتوريدات المحدودة، ومن خلال بيع حصصه المتبقية البالغة ألفي وتسعمائة وثمانية وثلاثون (٢,٩٣٨) حصة والبالغة قيمتها الاسمية مليونين وتسعمائة وثمانية وثلاثون ألف (٢,٩٣٨,٠٠٠) ريال سعودي لشركة اير برودكتس ليسينج بي.في.؛

حيث أن الطرف الرابع قرر الانسحاب من الشركة ببيع أربعة آلاف وأربعمائة وسبعة (٤,٤٠٧) حصة من حصصه في الشركة والبالغة قيمتها الاسمية أربعة ملايين وأربعمائة وسبعة آلاف (٤,٤٠٧,٠٠٠)

Head Office: P.O. Box 595 Jeddah 21421 Tel.: 662-1500 Fax 662-2425 Telex 607465 HASHIM SJ - C.C.J 4004 C.Tr. 4030002376 Capital SR 47,000,000 Fully Paid



شركة عبدالله هاشم للغازات والمعدات الصناعية المحدودة
Abdullah Hashim Industrial Gases & Equipment Co. Ltd.

| English | Arabic |
|---|---|
| Riyals to United Welding & Supplies Co. Ltd and by selling the remaining one thousand four hundred and sixty eight (1,468) shares with a nominal value of one million four hundred and sixty eight thousand (1,468,000) Saudi Riyals to Air Products Leasing B.V.; | ريال سعودي لمصلحة الشركة المتحدة لمعدات اللحام والتوريدات المحدودة، ومن خلال بيع حصته المتبقية البالغة ألف وأربعمائة وثمانية وستون (١,٤٦٨) حصة والبالغة قيمتها الاسمية مليون وأربعمائة وثمانية وستون ألف (١,٤٦٨,٠٠٠) ريال سعودي لشركة اير برودكتس ليسينج بي.في.؛ |
| Whereas the Fifth Party has decided to withdraw from the Company by selling four thousand four hundred and seven (4,407) shares in the Company with a nominal value of four million four hundred and seven thousand (4,407,000) Saudi Riyals to United Welding & Supplies Co. Ltd and by selling the remaining one thousand four hundred and sixty eight (1,468) shares with a nominal value of one million four hundred and sixty eight thousand (1,468,000) Saudi Riyals to Air Products Leasing B.V.; | حيث أن الطرف الخامس قرر الانسحاب من الشركة ببيع أربعة آلاف وأربعمائة وسبعة (٤,٤٠٧) حصة من حصصه في الشركة والبالغة قيمتها الاسمية أربعة ملايين وأربعمائة وسبعة الاف (٤,٤٠٧,٠٠٠) ريال سعودي لمصلحة الشركة المتحدة لمعدات اللحام والتوريدات المحدودة، ومن خلال بيع حصته المتبقية البالغة ألف وأربعمائة وثمانية وستون (١,٤٦٨) حصة والبالغة قيمتها الاسمية مليون وأربعمائة وثمانية وستون ألف (١,٤٦٨,٠٠٠) ريال سعودي لشركة اير برودكتس ليسينج بي.في.؛ |
| Whereas United Welding & Supplies Co. Ltd and Air Products Leasing B.V. have decided to purchase the shares referred to above with all rights and liabilities attached thereto, and the Parties' respective signatures on this Amendment constitute a final settlement and release in respect thereof; | وحيث أن الشركة المتحدة لمعدات اللحام والتوريدات المحدودة وشركة اير برودكتس ليسينج بي.في. قررا شراء الحصص المشار إليها أعلاه بما يترتب عليها من حقوق والتزامات، وإن توقيع الأطراف على هذا التعديل يعتبر تسوية ومخالصة نهائية. |
| Whereas, the First Party, the Second Party, the Third Party, the Fourth Party and the Fifth Party acknowledge receipt of the price of the shares from United Welding & Supplies Co. Ltd and Air Products Leasing B.V.; | وحيث أن الطرف الأول والطرف الثاني والطرف الثالث والطرف الرابع والطرف الخامس يقرون بأنهم قد استلموا كامل ثمن الحصص من الشركة المتحدة لمعدات اللحام والتوريدات المحدودة ومن شركة اير برودكتس ليسينج بي.في.؛ |
| Whereas the Parties' respective signatures on this Amendment constitute a final settlement and release in respect thereof; | وحيث أن توقيع الأطراف على هذا التعديل يعتبر تسوية ومخالصة نهائية. |
| Whereas United Welding & Supplies Co. Ltd and Air Products Leasing B.V. wish to amend the objects of the Company; | وحيث أن الشركة المتحدة لمعدات اللحام والتوريدات المحدودة وشركة اير برودكتس ليسينج بي.في. يرغبا بتعديل أغراض الشركة؛ |
| Whereas United Welding & Supplies Co. Ltd and Air Products Leasing B.V. wish to increase the Company's capital from forty seven million (47,000,000) Saudi Riyals to one hundred and twenty seven million (127,000,000) Saudi Riyals, by way of transfer of the capital increase amount equal to eighty million (80,000,000) Saudi Riyals from the retained earnings account | وحيث أن الشركة المتحدة لمعدات اللحام والتوريدات المحدودة وشركة اير برودكتس ليسينج بي.في. يرغبا بزيادة رأسمال الشركة من سبعة وأربعين مليون (٤٧,٠٠٠,٠٠٠) ريال سعودي إلى مائة وسبعة وعشرون مليون (١٢٧,٠٠٠,٠٠٠) ريال سعودي من خلال تحويل زيادة رأس المال البالغة ثمانين مليون (٨٠,٠٠٠,٠٠٠) ريال سعودي من حساب الأرباح المبقاة للشركة إلى حساب رأسمال الشركة؛ |

بالعينة الخاصة للاستشاريين

3

المركز الرئيسي ص.ب ٥٩٥ جدة ٢١٤٢١ هاتف ٦٩٢-١٥٠٠ فاكس ٦٧٢-٢٤٢٥ تلكس ٦٠٧٤٦٥ HASHIM SJ — C.C.J 4091 C.N. 4030023276 Capital SR 47,000,000 Fully Paid
Head Office: P.O. Box 595 Jeddah 21421 Tel: 692-1500 Fax: 672-2425 Telex 607465 HASHIM SJ — C.C.J 4091 C.N. 4030023276 Capital SR 47,000,000 Fully Paid

 شركة عبدالله هاشم للمبيدات والغازات الصناعية المحدودة
Abdullah Hashim Industrial Gases & Equipment Co. Ltd.

to the capital account of the Company;

Now, Therefore, the Parties have unanimously resolved to amend the Company's Articles of Association as follows:

لذا فقد قرر الأطراف بالإجماع تعديل عقد تأسيس الشركة على النحو التالي:

**First:**

أولاً:

The Preamble above shall be an integral part of this resolution.

تعتبر المقدمة أعلاه جزءاً لا يتجزأ من هذا القرار.

**Second:**

ثانياً:

The Preamble of the Company's Articles of Association, shall be amended such that the current shareholders who own the Company shall be:

تعديل مقدمة عقد التأسيس ليصبح الشركاء الحاليون المالكون للشركة هم:

1.  United Welding & Supplies Co. Ltd, a limited liability company, organized under the laws of Saudi Arabia, with Commercial Registration Certificate No. 4030121304 dated 26/12/1417H whose Articles of Association are recorded with the Jeddah Notary number 181 volume 1/5/2 number 129 for the year 1417H having its registered address at P.O. Box 595, Jeddah, 21421 represented in these Articles by its manager registered in the Commercial Register.
    ("First Party")

١- الشركة المتحدة لمعدات اللحام والتوريدات المحدودة، شركة سعودية ذات مسئولية محدودة، المقيدة بالسجل التجاري بجده برقم ٤٠٣٠١٢١٣٠٤ تاريخ ١٤١٧/١٢/٢٦هـ والمثبت عقد تأسيسها لدى فضيلة كاتب عدل جده تحت رقم ١٨١ من الجلد ٢/٥/١ بعدد ١٢٩ لعام ١٤١٧هـ، وعنوانه في ص.ب. ٥٩٥ جده ٢١٤٢١ و يمثلها في هذا العقد مديرها المسجل في السجل التجاري.

("الطرف الأول")

2.  Air Products Leasing B.V., a company organized under the laws of Netherlands with Commercial Registration number 29048444, with its head office located at Kanaalweg 15, NL-3526 KL, Utrecht, Netherlands, represented in these Articles by its manager registered in the Commercial Register.
    ("Second Party")

٢- شركة اير برودكتس ليسينج بي.في.، شركة مؤسسة وفقاً لقوانين هولاندا بسجل تجاري رقم ٢٩٠٤٨٤٤٤، ومركزها الرئيسي في كانالويج ١٥، ن ل ٣٥٢٦ ك ل، أوتريخت، هولاندا ويمثلها في هذا العقد مديرها المسجل في السجل التجاري.

("الطرف الثاني")

**Third:**

ثالثاً:

The remainder of the Articles of Association shall be amended to read in their entirety as follows:

تعديل باقي مواد عقد تأسيس الشركة وإعادة صياغتها بالكامل كما يلي:





شركة عبدالله هاشم للمعدات والغازات الصناعية المحدودة
Abdullah Hashim Industrial Gases & Equipment Co. Ltd.

**1- Name of the Company**

١ – إسم الشركة:

The name of the company shall be "Abdullah Hashim Gases & Equipment Co. Limited" (a limited liability company).

إسم الشركة هو شركة عبدالله هاشم للمعدات والغازات الصناعية المحدودة (شركة ذات مسؤولية محدودة).

**2- Objects of the Company**

٢ – أغراض الشركة

The objectives of the company are wholesale and retail trade and import of atmospheric gases (oxygen, nitrogen, argon, acetylene, medical nitrous oxide, carbon dioxide, and other industrial, medical, special (blended) gases, refrigerant gases and different gases, as well as necessary cylinders and containers, di-fluoro ethylene, atmospheric and medical gas equipment, and devices, tools and equipment pertaining to gas welding and gas cutting, safety equipment, fire extinguishers, tools, equipment for industrial maintenance workshops, and equipment for atmospheric, industrial and gas plants, antirust materials, medical gas networks, safety tools and other industrial equipment;

إن أغراض الشركة هي تجارة الجملة والتجزئة واستيراد الغازات الجوية (أكسجين، نيتروجين، أرجون، أستيلين، أكسيد نتروز طبي، وثاني أكسيد الكربون وغيرها من الغازات الصناعية والطبية والمخصوصة (المخلوطة) وغازات التبريد والغازات المختلفة وما يلزمها من اسطوانات وحاويات، ومادة دي فلورو إيثيلين ومعدات الغازات الجوية والطبية وأجهزة ومعدات وأدوات وأسلاك اللحام والقص بالغاز والكهرباء وأدوات ومعدات السلامة وطفايات الحريق وأدوات ومعدات ورش الصيانة الصناعية ومعدات مصانع الغازات الجوية والصناعية والطبية ، ومواد مانع الصداء وشبكات الغازات الطبية وأدوات السلامة وغير ها من المعدات الصناعية،

the production of atmospheric gases (oxygen, nitrogen, helium, argon, acetylene, medical nitrous oxide, hydrogen, helium, ammonia, nitrous oxide gas, carbon dioxide gas, liquid air, compressed air, acetylene gas) and other industrial and medical gases, mixed gases, specific gases and freon, and the production of liquid hydrocarbons and high-purity hydrogen gas, and extinguishers;

وإنتاج الغازات الجوية (أكسجين، نيتروجين، هيليوم، أرجون، أستيلين، أكسيد نيتروطبي والهيدروجين، والهيليوم والأمونيا، وغاز أكسيد النيتروز، وغاز ثاني أكسيد الكربون، هواء سائل وهواء مضغوط وغاز الأستيلين) وغيرها من الغازات الصناعية والغازات الطبية، وغازات مخلوطة، والغازات المخصوصة والفريون وإنتاج هيدروكربونات سائلة مخلوطة وغاز هيدروجين عالي النقاوة، وأجهزة إطفاء،

as well as installation of plants for manufacturing of atmospheric, industrial and medical gases together with their accessories for external customers in accordance with licenses granted to these customers; extension, maintenance and setting up of medical and industrial gas networks; supply of various gases to plants through direct supply lines, maintenance, operation and management of gas plants and their utilities, processing or safe disposal of all types of waste by applicable scientific methods, (and the setting up of a filling plant for all types of refrigerant gases manufactured by Dereon De Nomo International.

وتركيب مصانع غازات جوية وصناعية وطبية وملحقاتها لعملاء خارج الشركة بما يتفق مع التراخيص الممنوحة لهؤلاء العملاء وتمديد وصيانة وإنشاء شبكات الغازات الطبية والصناعية وإمداد المصانع بالغازات المختلفة عن طريق خطوط إمداد مباشرة، وصيانة وتشغيل وإدارة مصانع الغازات ومرافقها ومعالجة جميع أنواع النفايات أو التخلص منها بشكل آمن وبالطرق العلمية المتبعة، وإقامة مصنع لتعبئة جميع أنواع غاز التبريد صنع درين دي نومو انترناشيونال.

**Article 3: Participation in other Companies**

المادة ٣: إشتراك الشركة مع الغير

The Company may own shares in other existing companies or

يجوز للشركة أن تمتلك الحصص والأسهم في شركات أخرى قائمة أو


ISO - 0002 Approved


CGA Member 5


DOT Approved


PGA Approved.

Head Office: P.O. Box 595, Jeddah 21421 Tel.: 662-1500 Fax 662-2425 Telex 607445 HASHIB SJ - C.C.J 4004 C.R. 4030023278 Capital SH 47.000,000 Fully Paid

AHG  شركة عبدالله هاشم للغازات الصناعية المحدودة
Abdullah Hashim Industrial Gases & Equipment Co., Ltd.

consolidate therewith. The Company may also participate with others in setting up joint ventures, partnerships, limited liability companies and joint stock companies to conduct similar or complementary activities after satisfying the relevant laws and regulations. The Company may dispose of such shares after obtaining the approval of the competent authority, but may not act as a broker.

تندمج معها ولها حق الاشتراك مع الغير في تأسيس مشاريع مشتركة أو مشاركات أو شركات ذات مسئولية محدودة أو مزاولة نشاط مماثل في هذا الشأن، بعد استيفاء ما تتطلبه الأنظمة والتعليمات المتعلقة في على ألا يشمل ذلك الوساطة في تداولها.

### Article 4:  Head Office

The head office of the Company shall be in the City of Jeddah, Kingdom of Saudi Arabia. The Company may transfer its head office to any other place in the Kingdom of Saudi Arabia and may establish branches within and/or outside the Kingdom if the interests of the Company so require, subject to the approval of the Board of Managers and the receipt of any necessary governmental approvals.

المادة ٤ : المركز الرئيسي للشركة

يكون المركز الرئيسي للشركة في مدينة جدة بالمملكة العربية السعودية، وللشركة الحق في نقل مركزها الرئيسي إلى أي مكان آخر في المملكة العربية السعودية ولها الحق في افتتاح فروع لها داخل و/أو خارج المملكة متى ما اقتضت مصلحة الشركة وذلك بموافقة مجلس المديرين وبعد الحصول على موافقة الجهات الحكومية المختصة.

### Article 5:  Duration of the Company

The Company has been formed for a period of twenty-five (25) years starting from the date of its registration in the Commercial Register in the Kingdom of Saudi Arabia. The duration of the Company will automatically be extended for five (5) year periods, unless one of the shareholders notifies the others, of its desire not to continue the Company at least six (6) months prior to the expiration of the initial period or any subsequent period.

المادة ٥ : مدة الشركة

تأسست الشركة لمدة خمسة وعشرون (٢٥) سنة تبدأ من تاريخ قيدها في السجل التجاري بالمملكة العربية السعودية وتجدد تلقائيا لمدة خمسة (٥) سنوات أخرى ما لم يخطر أحد الشركاء الشركاء الآخرين برغبته في عدم الاستمرار ويكون ذلك قبل نهاية المدة الأصلية أو المجددة بستة (٦) أشهر على الأقل.

### Article 6:  Capital

The Company's capital shall be one hundred and twenty seven million Saudi Riyals (SR 127,000,000) divided into one hundred and twenty seven thousand (127,000) shares of equal value of one thousand Saudi Riyals (SR 1,000) each share. Said shares have been allocated among the Shareholders in the following manner:

المادة ٦ : رأسمال الشركة

حدد رأسمال الشركة بمبلغ مائة وسبعة وعشرون مليون (١٢٧,٠٠٠,٠٠٠) ريال سعودي، مقسم إلى مائة وسبعة وعشرون ألف (١٢٧,٠٠٠) حصة نقدية متساوية القيمة، قيمة كل حصة ألف (١,٠٠٠) ريال سعودي تم توزيعها على الشركاء على النحو التالي:






**AHG.** شركة عبدالله هاشم للمعدات والغازات الصناعية المحدودة
Abdullah Hashim Industrial Gases & Equipment Co. Ltd.

| Shareholder's Name | No. of Shares | Value of Share (SR) | Total Value (SR) | Percentage |
|---|---|---|---|---|
| United Welding & Supplies Co. Ltd | 95,250 | 95,250,000 | 1,000 | 75% |
| Air Products Leasing B.V. | 31,750 | 31,750,000 | 1,000 | 25% |
| Total | 127,000 | 127,000,000 | 1,000 | 100% |

| الشركاء | عدد الحصص | قيمة الحصة (ريال) | القيمة الاسمية | النسبة المئوية |
|---|---|---|---|---|
| الشركة المتحدة لصناعة اللحام والتوريدات المحدودة | ٩٥,٢٥٠ | ١,٠٠٠ | ٩٥,٢٥٠,٠٠٠ | %٧٥ |
| شركة اير برودكس ليسنج بي.في. | ٣١,٧٥٠ | ١,٠٠٠ | ٣١,٧٥٠,٠٠٠ | %٢٥ |
| المجموع | ١٢٧,٠٠٠ | ١,٠٠٠ | ١٢٧,٠٠٠,٠٠٠ | %١٠٠ |

The Shareholders hereby declare that the shares have been allocated as set forth above and that the initial capital of the Company amounting to forty seven million Saudi Riyals (SAR 47,000,000) has been paid upon the establishment of the Company. The amount of the increase has been paid by way of transfer of the capital increase amount equal to eighty million (80,000,000) Saudi Riyals from the retained earnings account to the capital account of the Company in accordance with the auditor certificated dated 27/2/1433H.

ويقر الشركاء بأنه قد تم توزيع الحصص فيما بينهما كما هو موضح أعلاه وتم الوفاء بقيمة رأس المال الأساسي البالغ سبعة واربعون مليون (٤٧,٠٠٠,٠٠٠) ريال سعودي عند التأسيس. أما الزيادة في رأس المال فقد تم الوفاء بها من خلال تحويل مبلغ ثمانين مليون (٨٠,٠٠٠,٠٠٠) ريال سعودي من حساب الأرباح المبقاة للشركة إلى حساب رأسمال الشركة بموجب شهادة المحاسب القانوني بتاريخ ١٤٣٣/٢/٢٧هـ.

### Article 7:  Increase or Reduction of Capital

المادة ٧: زيادة أو تخفيض رأس المال

7.1. The capital of the Company may be increased with the unanimous consent of the shareholders if the increase in the Company's capital is affected by raising the nominal value of shareholders' shares or by issuing new shares whose value must be paid by all of the shareholders, in proportion to their respective participation in the Company's capital. Apart from the two methods referred to above, the capital of the Company may be increased with the consent of shareholders representing at least three-fourths (3/4) of the capital of the Company.

٧-١ يجوز بموافقة جميع الشركاء زيادة رأسمال الشركة إذا تمت الزيادة عن طريق رفع القيمة الاسمية لحصص الشركاء أو إذا تمت الزيادة عن طريق إصدار حصص جديدة، مع إلزام جميع الشركاء بدفع قيمتها الاسمية بنسبة مشاركة كل منهم في رأسمال الشركة، وباستثناء الحالتين المشار إليهما يجوز زيادة رأسمال الشركة بموافقة أغلبية الشركاء الذين يمثلون ثلاثة أرباع (٣/٤) رأسمال الشركة على الأقل.

7.2. The capital of the Company may also be decreased by a decision of the General Meeting, provided that the

٧-٢ يجوز بقرار من جمعية الشركاء تخفيض رأسمال الشركة بشرط ألا يقل رأس المال عن الحد الأدنى المنصوص عليه وفقاً





COA Member   7          DOY Approved          PCA Approved

 شركة عبدالله هاشم للمعدات والغازات الصناعية المحدودة

Abdullah Hashim Industrial Gases & Equipment Co. Ltd.

capital may not become less than the minimum amount allowed, and in accordance with the following guidelines:

للأوضاع التالية:

7.2.1. If the capital is decreased because it is in excess of the Company's needs, the Company's creditors must be notified pursuant to a notice to be posted in a daily news.paper published in the city where the Head Office of the Company is established. The creditors may object to such decrease within sixty (60) days of the publication date. In the event one of the creditors' objects and presents to the Company documents substantiating its claim within the above-mentioned period of time, the Company must either pay the debt if it is due at that time or provide an adequate guarantee of payment if the debt is due at a later date.

١-٢-٧ إذا كان تخفيض رأس المال نتيجة زيادته عن حاجة الشركة، وجب إشعار الدائنين ونشر قرار التخفيض في جريدة يومية توزع في المدينة التي يقع فيها المركز الرئيسي للشركة، ويحق للدائنين الاعتراض على ذلك التخفيض خلال ستين (٦٠) يوماً من تاريخ النشر. فإذا اعترض أحد الدائنين وقدم للشركة مستندات مؤيدة لادعائه خلال المدة المذكورة، وجب على الشركة أن تدفع الدين إذا كان حالاً أو أن تقدم ضماناً كافياً للوفاء به إذا كان آجلاً.

7.2.2. In the event the Company has incurred losses exceeding one half (1/2) of its capital, its capital may not be decreased.

٢-٢-٧ إذا كان التخفيض نتيجة خسارة الشركة وبلغت نسبة هذه الخسارة نصف (١/٢) رأس المال فإنه لا يجوز إجراء التخفيض.

### Article 8: Rights of Shareholders

المادة ٨: حقوق الشركاء

8.1. All shares confer equal rights and obligations upon their holders and each share in the capital of the Company shall entitle its holder to one vote and an equal proportionate share in the assets of the Company upon liquidation. Each shareholder shall be entitled to participate in the deliberations of the General Meetings and to use and enjoy its voting and other rights in accordance with the provisions of these Articles and the Companies Regulations.

١-٨ ترتب كل الحصص لأصحابها حقوقاً والتزامات متساوية، وتخول كل حصة في رأسمال الشركة لصاحبها صوتاً واحداً وحصصه نسبة متساوية في أصول الشركة عند تصفيتها. ويحق لكل شريك أن يشترك في المداولة في جمعية الشركاء وأن يستخدم حقه في التصويت وغير ذلك من الحقوق وفقاً لأحكام هذا العقد ونظام الشركات.

8.2. If any shares are transferred in accordance with Article (8) hereof, all rights and obligations attached to a share shall be automatically transferred to the new owner. Ownership of shares and the determination of rights and obligations arising there from shall be governed by the provisions of these Articles and the decisions of the General Meetings.

٢-٨ إذا تم تحويل ملكية أي حصص وفقاً للمادة (٨) من هذا العقد فإن جميع الحقوق والالتزامات الملحقة بالحصة تنتقل تلقائياً إلى المالك الجديد. وتخضع ملكية الحصص وتحديد الحقوق والالتزامات الناشئة عنها لأحكام هذا العقد ولقرارات جمعية الشركاء.

8.3. Each shareholder shall have the right to examine all books, records, accounts, inventory lists and other

٣-٨ يحق لكل شريك فحص جميع الدفاتر والسجلات والحسابات وكشوف الجرد والمستندات الأخرى الخاصة بالشركة خلال

  

ISO 9001 2000 REGISTERED

CQA Member 8    DOT Approved    PCA Approved

Head Office: P.O. Box 4094 Jeddah 21491   Tel.: 662-1500 Fax 662-2425 Telex 607405 HASHIN SJ • C.C.I 4094 C.R. 4030023276 Capital: SR 47,000,000 Fully Paid



شركة عبدالله ناشم للمعدات والغازات الصناعية المحدودة
**Abdullah Nashin Industrial Gases & Equipment Co. Ltd.**

documents of the Company during normal working hours. It is the responsibility of the Board of Managers to facilitate the exercise of this right by the shareholders.

ساعات العمل العادية. ويقع على عاتق مجلس مديري الشركة مسؤولية تسهيل ممارسة هذا الحق من قبل الشركاء.

### Article 9: Shares

المادة 9: الحصص

9.1.   The shares shall be freely transferable between the shareholders and their legal successors. No shareholder may assign any of its shares to a third party, with or without consideration, unless such shareholder has first offered the same to the other shareholder in accordance with Article 165 of the Companies Regulations.

١-٩   الحصص قابلة للانتقال بين الشركاء وكذلك ورثتهم الشرعيين، ولا يجوز لأي شريك التنازل عن أي حصة أو أكثر من حصصه للغير بعوض أو بغير عوض، إلا بموافقة بقية الشركاء، ومع ذلك يجوز لباقي الشركاء استرداد الحصة أو الحصص التي يرغب أحد الشركاء في التنازل عنها طبقاً للمادة ١٦٥ من نظام الشركات.

9.2.   No shareholder may pledge, mortgage or otherwise encumber any of its shares without the prior written consent of the other shareholders and no such action shall be binding on the Company or the other shareholders in the absence of such consent.

٢-٩   لا يجوز لأي شريك أن يرهن رهناً حيازياً أو غير حيازي، أو أن يرتب أية حقوق على أية حصة من حصصه بدون الموافقة الخطية المسبقة لجميع الشركاء، وأن يكون أي تصرف من هذا النوع ملزماً للشركة أو الشركاء الآخرين في حالة عدم وجود تلك الموافقة.

9.3.   A share in the capital of the Company is indivisible. If for any reason the ownership of a share is vested in more than one person, the Company shall be entitled to suspend the enjoyment of rights conferred by such share until the joint owners have chosen from among themselves one person to be considered as sole owner of such share in relation to the Company. The Company may fix a period within which the joint owners shall make this choice. If they fail to do so within the period specified, the Company may offer the share for sale for the account of the joint owners to the other shareholders or a third party.

٣-٩   إن الحصة في رأسمال الشركة غير قابلة للتجزئة، وإذا تملك الحصة أكثر من شخص واحد لأي سبب كان، فيحق للشركة وقت التمتع بالحقوق الناشئة عن تلك الحصة إلى أن يختار الملاك المشتركين من بينهم شخص واحد يعتبر المالك الوحيد لتلك الحصة في مواجهة الشركة، ويجوز للشركة تحديد فترة معينة ليقوم الملاك المشتركون بذلك الاختيار، وإذا عجز الملاك المشتركون عن ممارسة هذا الاختيار خلال المدة المحددة، يجوز للشركة أن تعرض الحصة للبيع على الشركاء الآخرين أو للغير لحساب الملاك المشتركين.







CGA Member  9                                BOT Approved                    PQA Approved

 شركة عبدالله هاشم للمعدات والغازات الصناعية المحدودة
Abdullah Hashim Industrial Gases & Equipment Co. Ltd.

**Article 10:  Share Register**

المادة ١٠  سجل الحصص

10.1.  The Company shall establish and keep at its Head Office a Share Register in which it shall enter the names of the shareholders, the number of shares owned by each and all transactions affecting the shares.  No transfer of ownership of such shares shall be effective vis-à-vis the Company or any third party unless the reason for the transfer of ownership is entered in the aforementioned Register.  The Register must contain all of the following information:

١٠-١ تعد الشركة سجلاً خاصاً بالحصص، تحتفظ به في مركزها الرئيسي، ويقيد به أسماء الشركاء، وعدد الحصص التي يمتلكها كل منهم، وجميع التصرفات التي ترد على هذه الحصص، ولا ينفذ انتقال ملكية هذه الحصص في مواجهة الشركة أو الغير، إلا إذا تم قيد السبب الناقل للملكية في السجل المذكور. ويجب أن يشتمل السجل على جميع البيانات التالية:

10.1.1.  The name and nationality of each shareholder; in the case of a shareholder who is a natural person, his occupation, address and identity card (or passport) number and date;

١٠-١-١ اسم كل شريك وجنسيته، وفي حالة أن الشريك شخص طبيعي، فتحدد مهنته وعنوانه ورقم وتاريخ السجل المدني أو جواز السفر؛

10.1.2.  the number and value of the shares owned by each shareholder;

١٠-١-٢ عدد وقيمة الحصص التي يملكها كل شريك؛

10.1.3.  the number and value of shares which have been transferred, along with a description of the manner in which the shares were transferred - whether by sale, purchase, inheritance, gift or otherwise;

١٠-١-٣ عدد وقيمة الحصص التي يتم التصرف فيها مع بيان نوع التصرف مثل البيع أو الشراء أو الميراث أو الهبة إلى غير ذلك من التصرفات؛

10.1.4.  the name and signature of the transferor and the transferee;

١٠-١-٤ اسم المتصرف والمتصرف إليه وتوقيعهما؛

10.1.5.  the date of the transfer; and

١٠-١-٥ تاريخ التصرف في الحصص؛

10.1.6.  the number and value of shares owned by each shareholder after any such transfer.

١٠-١-٦ مجموع ما يملكه كل شريك من حصص بعد إجراء التصرف وقيمتها الاسمية

10.1.7.  The pages of the share register shall be numbered sequentially.  No page may be deleted nor any erasure or revision made to the information contained therein.

١٠-١-٧ يتم ترقيم صفحات السجل المذكور ترقيما متسلسلاً، ولا يجوز نزع أي صفحة من صفحاته، أو إجراء أي كشط أو تغيير في البيانات المدونة به.

10.1.8.  Each shareholder shall have the right to examine the share register during the normal working hours of the Company.

١٠-١-٨ يحق لكل شريك فحص سجل الحصص خلال ساعات العمل العادية للشركة.





Head Office: P.O. Box 593 Jeddah 21421 Tel.: 682-1500 Fax 682-2435 Telex 607465 HASHIN SJ - C.C.I 4064 C.R. 4030023276 Capital SR 07.000.000 Fully Paid



شركة عبدالله هاشم للمعدات والغازات الصناعية المحدودة
**Abdullah Hashim Industrial Gases & Equipment Co. Ltd.**

Article 11:  Management of the Company

المادة ١١: إدارة الشركة:

11.1. **Appointment of Board of Managers:**  The Company shall be managed by a Board of Managers composed of eight (8) managers, six (6) of whom shall be appointed by the First Party and the remaining two (2) shall be appointed by the Second Party. All appointments of managers shall be effected by written notice to the Company and the other shareholder(s). The shareholder who appointed a manager may remove that manager at any time by giving written notice to the Company and the other shareholder(s), without prejudice to that manager's right to compensation if the removal is without legal cause or at an improper time. In the event that a manager is removed or resigns or becomes incapacitated or otherwise unable to serve for any reason, the shareholder who appointed him shall promptly appoint a replacement in accordance with this Article 11.

١١-١ تعيين مجلس المديرين: يدير الشركة مجلس مديرين مؤلف من ثمانية (٨) مدراء، ستة (٦) منهم يعينهم الطرف الأول والاثنين (٢) الآخرين يعينهم الطرف الثاني. وتتم كافة تعيينات المدراء بإشعار خطي موجه إلى الشركة والشركاء الآخرين. ويجوز للشريك الذي عين مديراً عزل ذلك المدير في أي وقت بإشعار خطي يوجه إلى الشركة والشركاء الآخرين مع عدم الإخلال بحقه في التعويض إذا كان هذا العزل بدون سبب مشروع أو تم في وقت غير لائق. وفي حالة عزل أي مدير أو استقالته أو عجزه أو إذا ما أصبح بشكل أو آخر غير قادر على القيام بمهام عمله لأي سبب من الأسباب، فإن على الشريك الذي عينه أن يعين بديلاً عنه على وجه السرعة وذلك وفقاً لنص المادة ١١ هذه.

11.2. **Executive Manager:**  The Board shall appoint an Executive Manager of the Company, who may or may not be a member of the Board, to carry out the day to day management of the operations of the Company.

١١-٢ المدير التنفيذي: يعين مجلس المديرين مديراً تنفيذياً، الذي قد يكون أو لا يكون عضواً في مجلس المديرين، ليتولى إدارة أعمال الشركة اليومية.

11.3. **Meetings of the Board:**  Meetings of the Board of Managers shall be held at the Head Office of the Company or at such other places as may be agreed by a majority of the Board of Managers. Meetings shall be held at least twice a year and at such times as any four (4) managers of the Board of Managers and/or any shareholder may require upon at least thirty (30) days notice to the managers of the Board. The notice shall include the agenda and all documents pertaining to the business to be transacted at the meeting. The Board may waive these requirements for notice by a unanimous vote at the beginning of the meeting and before any other business is transacted.

١١-٣ اجتماعات مجلس المديرين: تنعقد اجتماعات مجلس المديرين في المركز الرئيسي للشركة أو في أي مكان آخر يتم الاتفاق عليه من قبل غالبية مجلس المديرين. وتنعقد الاجتماعات بناء على دعوة أي من أربعة (٤) مدراء في مجلس المديرين و/أو أي شريك وذلك بموجب إشعار مدته (٣٠) يوماً يوجه إلى المدراء في مجلس المديرين، على أن يتضمن الإشعار جدول أعمال الاجتماع وكافة الوثائق التي تتعلق بالأعمال التي سيتم تداولها في الاجتماع. ويجوز لمجلس المديرين التنازل عن متطلبات الإشعار تلك بالتصويت بالإجماع على ذلك في بداية الاجتماع وقبل تناول أية موضوعات أخرى.

A manager who is unable to attend a meeting of the Board of Managers or to take any other necessary action may, by written notice to the Company, give a proxy to any other person to cast a vote and otherwise.

ويجوز للمدير الذي يتعذر عليه حضور اجتماع مجلس المديرين أو اتخاذ أي إجراء ضروري آخر أن يقوم بموجب إخطار كتابي إلى الشركة، بمنح تفويضاً لأي شخص آخر للتصويت أو التصرف نيابة عنه في أي اجتماع أو أمر







شركة عبدالله هاشم للمنتجات والغازات الصناعية المحدودة
Abdullah Hashim Industrial Gases & Equipment Co. Ltd,

act on his behalf in connection with any particular meeting or matter.

محدد.

The presence of four (4) managers of the Board of Managers in person or by proxy with one (1) Manager at least representing each Shareholder shall be necessary to constitute a valid quorum. If, however, a quorum is not obtained for a validly called meeting then the meeting shall be postponed for seven (7) days and shall be held at the same time and place as the originally scheduled meeting. The quorum for the postponed meeting shall consist of any four (4) managers.

إن حضور أربعة (٤) من المدراء في مجلس المديرين بالأصالة أو بالنيابة بحضور مدير ممثل لكل طرف على الأقل ضروريا لتكوين النصاب اللازم لأي اجتماع. وإذا لم يكتمل هذا النصاب لاجتماع دعي له حسب الأصول، يؤجل الاجتماع لسبعة (٧) أيام على أن يعقد في نفس الوقت والمكان المقررين للاجتماع المؤجل، ويكون نصاب الاجتماع المؤجل الثاني بحضور أية أربعة (٤) من المدراء.

Meetings of the Board of Managers may be held by telephone, video conference, or other electronic means of communication that permits all managers present to be heard by all others present.

يجوز عقد اجتماعات مجلس المديرين عبر الهاتف، الفيديو كونفرنس أو أي وسيلة اتصال إلكترونية أخرى تسمح لجميع المديرين الحاضرين سماع جميع الحاضرين الآخرين.

The Board shall appoint a Secretary to prepare minutes of each meeting for approval by the Board.

ويعين المجلس سكرتيرا ليتولى إعداد محضر لكل اجتماع لاعتماده من قبل المجلس.

11.4.   Resolutions of the Board: Each manager of the Board of Managers shall have one (1) vote on any matter presented to the Board for decision. Resolutions of the Board of Managers shall require the affirmative vote of the majority of the managers in attendance at any duly convened meeting provided however that the following resolutions shall require the unanimous consent of the Board of Managers:

١١-٤   قرارات المجلس: لكل مدير في مجلس المديرين صوت واحد عند التصويت على أي مسألة تعرض على المجلس لاتخاذ قرار بشأنها، وتصدر قرارات مجلس المديرين بأكثرية أصوات المديرين الحاضرين لاجتماع دعي له حسب الأصول، شرط أن تتخذ القرارات التالية بإجماع مجلس المديرين:

(a)   any decision to amalgamate or merge with or acquire the shares of another company;

(أ) أي قرار بالإندماج أو الاستحواذ على شركة أخرى.

(b)   any decision to increase the share capital of the Company;

(ب) أي قرار زيادة رأسمال الشركة.

(c)   any decision to change the nationality of the Company.

(ج) أي قرار بتغيير جنسية الشركة.

After circulation, a resolution of the Board of Managers in writing signed by the requisite number of managers

وينشر أي قرار كتابي لمجلس المديرين يجرى التوقيع عليه بالتمرير من العدد المطلوب من المديرين، صحيحا ونافذا كما







**AHG**

شركة عبدالله هاشم للمعدات والغازات الصناعية المحدودة
Abdullah Hashim Industrial Gases & Equipment Co. Ltd.

shall be as valid and effective as if it had been adopted at a meeting of the Board of Managers duly convened and held.  Any such resolution may consist of several documents in like form each signed by or on behalf of one or more managers wherever they may be situated.

لو أقر في اجتماع لمجلس المديرين دعي له وعُقد حسب الأصول، ويجوز أن يصدر مثل هذا القرار من عدة نسخ متماثلة بوقع على كل منها، بالأصالة أو بالنيابة، مدير واحد أو أكثر حيثما كان مكانهم؛

## Article 12:  Shareholders' Meetings

المادة ١٢ : جمعية الشركاء

12.1.  The duly authorized representatives of each shareholder shall have the right to attend and take part in the deliberations of and vote at all shareholders' meetings.  Each shareholder shall provide the other shareholder(s) in writing from time-to-time with the names of the person(s) appointed to represent it at shareholders meetings and cast a vote on its behalf.

١٢-١ يحق لممثلي الشركاء المفوضين حسب الأصول، حضور جميع اجتماعات الشركاء والمشاركة في مداولاتها والتصويت فيها، وعلى كل شريك من حين لآخر أن يبلغ كتابياً الشركاء الآخرين بأسماء الأشخاص الذين يعينهم لتمثيله في جمعية الشركاء والتصويت نيابة عنه.

12.2.  Shareholders' meetings shall be held at the Head Office of the Company or at such other places as may be agreed by the shareholders.  Shareholders' meetings shall be convened upon thirty (30) day notice to the shareholders from the Board of Managers, the Auditor of the Company and/or any shareholder.  Notice of each shareholders meeting shall include the agenda and all documents concerning the business to be transacted at the meeting.  The shareholders may waive these requirements for notice by a vote at the beginning of a meeting and before any other business is transacted.

١٢-٢ تنعقد جمعية الشركاء في المركز الرئيسي للشركة أو أي مكان آخر، يتم الاتفاق عليه بين الشركاء. وتنعقد جمعية الشركاء بموجب إخطار مدته ثلاثون (٣٠) يوماً يوجه من قبل مجلس المديرين، أو مراقب الحسابات، أو أحد الشركاء. ويتضمن إشعار دعوة جمعية الشركاء جدول أعمال الاجتماع وكافة الوثائق المتعلقة بالأعمال التي سيتم تداولها في الاجتماع. ويجوز للشركاء التنازل عن متطلبات الإخطار، ذلك بالتصويت على ذلك في بداية الاجتماع وقبل تناول أي موضوعات أخرى.

12.3.  The Board of Managers of the Company shall convene an annual general meeting within six (6) months after the close of each fiscal year of the Company to:

١٢-٣ على مجلس المديرين دعوة جمعية الشركاء السنوية خلال ستة (٦) أشهر من انتهاء السنة المالية للشركة، وذلك من أجل ما يلي:

12.3.1.  Review and approve a report from the Board of Managers of the Company concerning the management and administration of the Company;

١٢-٣-١ مراجعة واعتماد تقرير مجلس مديري الشركة عن إدارة وإشراف الشركة.

12.3.2.  Review and approve the auditor's report for the preceding fiscal year;

١٢-٣-٢ مراجعة واعتماد تقرير مراقبي الحسابات عن السنة المالية المنصرمة؛

12.3.3.  Consider and take any appropriate decision in relation to any of the foregoing matters;

١٢-٣-٣ النظر في أي من الأمور السابق ذكرها واتخاذ أي قرار مناسب بشأنها؛

12.3.4.  Appoint or reappoint auditors to audit the Company's

١٢-٣-٤ تعيين أو إعادة تعيين مراقبي الحسابات لتدقيق حسابات





PGA Number 13

DOT Approved

PCA Approved

Head Office: P.O. Box 595, Jeddah 21421 Tel: 062-1500 Fax 662-2425 Telex 607465 HASHIM SJ . C.C.I 4094 C.R. 4030023276 Capital SR 47.000.000 Fully Paid



شركة عبدالله هاشم للمعدات والغازات الصناعية المحدودة
**Abdullah Hashim Industrial Gases & Equipment Co. Ltd.**

accounts for the ensuing fiscal year and determine their fees; and

الشركة للسنة المالية التالية وتحديد أتعابهم؛

12.3.5. Discuss and decide upon any other business or matter relating to the Company.

٥-٣-١٢  مناقشة أية أعمال أو أمور أخرى تتعلق بالشركة واتخاذ القرارات بشأنها.

12.3.6. The quorum for Shareholders' Meeting of shareholders shall be shareholder(s) present in person or by proxy holding not less than 50% of the total number of Shares issued from time to time. If there shall be no quorum within 120 minutes of the time appointed for a shareholders' meeting the meeting shall be adjourned to a specified time and place (which shall not be earlier than 10 days after the date originally fixed for the meeting). If any adjourned meeting a quorum is not present within 120 minutes of the time appointed for the adjourned meeting or such longer interval as the Chairman of the meeting may think fit to allow, the shareholders present for the postponed meeting shall constitute a valid quorum, provided they represent shareholders holding at least fifty percent (50%) of the Company's capital.

٦-٣-١٢  النصاب اللازم لصحة انعقاد أي اجتماع لجمعية الشركاء هو حضور الشركاء أو مفوضيهم ممن يملكون خمسين بالمائة (٥٠%) من أسهم الشركة. إذا لم يتوفر النصاب خلال ١٢٠ دقيقة من الوقت المحدد للاجتماع يؤجل إلى وقت ومكان آخر (على أن يكون الاجتماع المؤجل بعد عشرة ١٠ أيام على الأقل من تاريخه). وإذا لم يتوفر نصاب الاجتماع المؤجل خلال ١٢٠ دقيقة من موعد أو مدة أطول التي قد يسمح بها رئيس الاجتماع، يشكل ممثلو الشركاء المفوضون حسب الأصول الحاضرون في الاجتماع المؤجل النصاب اللازم لهذا الاجتماع بشرط أن يمثلوا على الأقل خمسين بالمائة (٥٠%) من رأسمال الشركة.

12.3.7. The shareholders shall designate, from among those appointed to represent each of them at General Meetings, one person who shall chair General Meetings. The Chairman shall select a person to act as the Secretary for the meeting and that person will ensure that an adequate and accurate record of shareholders' meetings is made and kept.

٧-٣-١٢  يختار الشركاء واحدا من ممثليهم ليتولى رئاسة جمعية الشركاء، ويتعين على الرئيس أن يختار شخصا ليكون سكرتيرا للجمعية، وعلى هذا الشخص أن يكفل بتأمين والاحتفاظ بسجل كامل ودقيق باجتماعات الشركاء.

### Article 13: Shareholders' Resolutions

**المادة ١٣: قرارات الشركاء**

13.1. Shareholders' resolutions relating to any change in the nationality of the Company or any increase in the financial burdens of the shareholders shall be unanimous. The affirmative vote of shareholders holding at least seventy five percent (75%) of the capital of the Company shall be required in order to amend these Articles of Association. All other resolutions shall require the affirmative vote of those representing at least fifty percent (50%) of the Capital

١-١٣  تصدر قرارات الشركاء بالإجماع فيما يتعلق بتغيير جنسية الشركة أو زيادة الأعباء المالية للشركاء. وتصدر قرارات الشركاء فيما يتعلق بتعديل عقد الشركة بموافقة الشركاء الذين يملكون ٧٥% من رأس المال على الأقل، وفيما عدا ذلك تصدر القرارات في المسائل الأخرى بموافقة الشركاء الذين يملكون خمسين في المائة (٥٠%) من رأسمال الشركة على الأقل.


ISO 9002 APPROVED


GOA Number 14

DOT Approved

PGA Approved

Head Office: P.O. Box 659, Jeddah 21421, Tel.: 662-1500 Fax 662-2425 Telex 607465 HASHIM SJ - C.C.I 4094 C.R. 4030023276 Capital SR 47,000,000 Fully Paid



**Abdullah Hashim Industrial Gases & Equipment Co, Ltd,**
شـركة عبدالله هاشـم للمعدات والغازات الصناعية المحدودة

of the Company.

13.2: After circulation, a resolution in writing signed by the requisite number of shareholders shall be as valid and effective as if it had been passed at a Shareholders' Meeting duly convened and held. Any such resolution may consist of several documents in like form each signed by the duly authorized representatives of one or more of shareholders wherever they may be situated,

٢-١٣   يعتبر أي قرار كتابي يجري توقيعه بالتمرير من البند المطلوب من الشركاء صحيحاً ونافذاً كما لو كان قد جرى لاجتماع لجمعية الشركاء دعي له وعقد حسب الأصول ويجوز أن يصدر مثل هذا القرار من عدة نسخ مماثلة وأن يوقع عليها ممثلون مخولون لشريك أو أكثر حيثما كان مكانهم.

**Article 14: Books of Accounts and Annual Financial Statements**

المادة ١٤ : لدفاتر الحسابات والقوائم المالية السنوية

14.1 The Board of Managers of the Company shall ensure that the Company maintains proper books of accounts and complete and accurate records regarding:

١-١٤   على مجلس مديري الشركة أن يضمن احتفاظ الشركة بدفاتر حسابات صحيحة وسجلات كاملة ودقيقة فيما يخص:

14.1.1 All income and expenditures of the Company;

١-١-١٤   جميع بنود دخل ومصروفات الشركة؛

14.1.2 All contracts entered into by the Company;

٢-١-١٤   جميع العقود التي تبرمها الشركة؛

14.1.3 All purchases and sales made by the Company; and

٣-١-١٤   جميع المشتريات والمبيعات التي تقوم بها الشركة؛

14.1.4 The assets and liabilities of the Company.

٤-١-١٤   أصول وخصوم الشركة.

14.2 All books of account and records shall be maintained in accordance with generally accepted accounting principles and the regulations of the Kingdom of Saudi Arabia and kept at the Head Office of the Company.

٢-١٤   يتم الاحتفاظ بدفاتر الحسابات والسجلات وفقاً للمبادئ المحاسبية العامة المتعارف عليها وأنظمة المملكة العربية السعودية، ويتم حفظها في المركز الرئيسي للشركة.

**Article 15: Auditors**

المادة ١٥ : مراقب الحسابات

The shareholders shall cause an auditor to be appointed annually by a Shareholders' Resolution adopted at a General Meeting. The Auditor must be licensed to practice in the Kingdom in accordance with the Auditors' Regulations. The auditor shall ensure that the Articles of Association of the Company and the Companies Regulations are being applied. He shall review all inventories and final annual accounts and inspect the balance sheet and submit an annual report to each shareholder and to the Board of Managers of the Company. For that purpose he may review all the Company's books, documents and contracts entered into with third parties and may

يكون للشركة مراقب حسابات يختاره الشركاء سنوياً بقرار يصدر عنهم في اجتماع جمعية الشركاء، ويجب أن يكون مراقب الحسابات من المحاسبين المرخص لهم بالعمل في المملكة وفقاً لأحكام نظام المحاسبين، وعلى مراقب الحسابات التأكد من تطبيق عقد تأسيس الشركة ونظام الشركات. وعليه مراجعة قوائم الجرد والحسابات الختامية السنوية وفحص الميزانية العمومية وتقديم تقرير سنوي عن ذلك لكل شريك ولمجلس مديري الشركة، وله في سبيل ذلك الاطلاع على جميع دفاتر الشركة ووثائقها والعقود التي تبرمها الشركة مع الغير، وله أن يطلب الإيضاحات والبيانات التي يرى ضرورة الحصول عليها، ويحدد الشركاء أتعاب مراقب


Head Office: P.O. Box 655 Jeddah 21421  Tel: 662-1500 Fax 662-2425 Telex 607465 HASHIM SJ - C.C.I 4096 C.R. 4030023276 Capital SR 47,000,000 Fully Paid

شركة عبدالله هاشم للمعدات والغازات الصناعية المحدودة
**Abdullah Hashim Industrial Gases & Equipment Co. Ltd.**

الحسابات على أساس سنوي.

request clarification and information as he deems necessary.
The shareholders shall determine the Auditor's remuneration on
an annual basis.

**المادة ١٦: السنة المالية**

## Article 16: Fiscal Year

The first financial year commenced on the date of commercial
registration of the company and ended on 31st of December of
the said year. Each subsequent financial year shall last for a
period of twelve (12) months.

بدأت السنة المالية الأولى للشركة اعتبارا من تاريخ قيدها في السجل
التجاري وانتهت في ٣١ يناير من تلك السنة، وتكون مدة كل سنة مالية
بعد ذلك اثني عشر (١٢) شهرا ميلاديا.

The Board of Managers of the Company shall, within four (4)
months following the end of such fiscal year, prepare a balance
sheet, profit and loss account, and a report describing the
Company's activities and financial position and containing their
recommendations as to the distribution of profits. The Board of
Managers shall send to each shareholder and to the Companies'
Department at the Ministry of Commerce and Industry a copy
of these documents, together with a copy of the Auditor's
report, within two (2) months of their date of preparation.

يعد مجلس المديرين خلال أربعة (٤) أشهر من انتهاء كل سنة مالية
للشركة ميزانية عمومية وحساب الأرباح والخسائر وتقريرا عن نشاط
الشركة ومركزها المالي واقتراحاته بشأن توزيع الأرباح، وعلى
مجلس المديرين أن يرسل إلى كل شريك وإلى الإدارة العامة للشركات
بوزارة التجارة والصناعة نسخة من تلك الوثائق مع صورة من تقرير
مراقب الحسابات وذلك خلال شهرين (٢) من تاريخ إعدادها.

**المادة ١٧: توزيع الأرباح والخسائر**

## Article 17: Distribution of Profits and Losses

The annual net profits of the Company, after deduction of
depreciation, operating expenses and general expenses, shall be
distributed as follows:

بعد خصم الاستهلاك ومصروفات التشغيل والنفقات، يتم توزيع
الأرباح السنوية الصافية للشركة على النحو التالي:

17.1   The Company shall set aside ten percent (10%) of such
       profits to constitute the statutory reserve required by
       Article 176 of the Companies Law. The Company may
       cease setting aside this reserve when it reaches fifty
       percent (50%) of the share capital of the Company.

١٧-١ تجنب الشركة نسبة قدرها عشرة في المائة (١٠%) من أرباحها
كاحتياطي نظامي عملا بالمادة (١٧٦) من نظام الشركات،
ويجوز للشركة وقف هذا التجنيب متى بلغ الاحتياطي خمسون
في المائة (٥٠%) من رأسمال الشركة.

17.2   The remaining balance of the profits shall be distributed
       among the Shareholders pro rata according to the
       percentage of the shares owned by each shareholder,
       unless it is decided by by the Shareholders to set aside
       other reserves or bring forward the balance of profits ,
       totally or partially , to next financial year.

١٧-٢ يوزع باقي رصيد الأرباح الصافية على الشركاء بنسبة حصص
كل منهم في رأس المال، ما لم يقرر الشركاء تكوين احتياطيات
أخرى أو ترحيل رصيد الأرباح كليا أو جزئيا للسنة المالية
التالية.

17.3   Losses shall either be borne by the shareholders pro rata
       according to the percentage of shares owned by each
       shareholder or, if the shareholders so agree, carried over

١٧-٣ وفي حالة تحقيق خسائر فيتحملها الشركاء بنسبة ما يملكه كل
منهم من حصص في رأسمال الشركة، ما لم يتم الاتفاق على
ترحيلها للسنة التالية، ولا يجوز توزيع أرباح إلا بعد تغطية





ISO-9002 Approved       CGA Member  16       BOX Approved       PGA Approved

شركة عبدالله هاشم للغازات والتجهيزات الصناعية المحدودة
**Abdullah Hashim Industrial Gases & Equipment Co. Ltd.**

to the next fiscal year. No profits shall be distributed until the losses are fully covered. If the Company's losses reach one half (1/2) of its capital the Board of Managers of the Company must summon the shareholders to a meeting within a period not to exceed thirty (30) days from the date on which the losses reach this level in order to consider whether to continue the Company, in which case the shareholders must pay its debts, or to dissolve it. The resolution of the shareholders in this respect shall not be valid unless it is issued in accordance with Article 173 of the Companies Regulations, and the resolution must in all cases be published in the manner provided in Article 164 of the Companies Regulations. If the Company continues to pursue its business without the issuance of a decision to continue it pursuant to the foregoing conditions, or to dissolve it, the shareholders shall become jointly and severally liable to pay all of the Company's debts and any interested party may request that it be dissolved.

الخسائر بالكامل، وإذا بلغت خسائر الشركة نصف (١/٢) رأسمالها وجب على مجلس مديري الشركة دعوة الشركاء للاجتماع خلال مدة لا تزيد عن ثلاثين (٣٠) يوماً من تاريخ بلوغ الخسارة لهذا الحد للنظر في استمرار الشركة، مع التزام الشركاء بدفع ديونها، أو حلها، ولا يكون قرار الشركاء في هذا الشأن صحيحاً إلا إذا صدر طبقاً للمادة (١٧٣) من نظام الشركات، ويجب في جميع الأحوال إشهار هذا القرار بالطرق المنصوص عليها في المادة (١٦٤) من نظام الشركات، وإذا استمرت الشركة في مزاولة نشاطها دون صدور قرار باستمرارها بالشريط المتقدم أو حلها، أصبح الشركاء مسؤولين بالتضامن عن سداد جميع ديون الشركة، وجاز لكل ذي مصلحة أن يطلب حلها.

### Article 18: Dissolution and Liquidation of the Company

18.1 The Company may be dissolved for any of the reasons for dissolution contained in Article 15 of the Companies Regulations. Upon the Company's dissolution it shall enter the stage of liquidation in accordance with the provisions of Chapter 11 of the Companies Regulations. In case of voluntary liquidation, the shareholders shall appoint one or more liquidator(s) for purposes of liquidating the Company and shall determine their authority and fees and the following must be observed.

18.2 A report certified by a chartered accountant licensed to practice in the Kingdom of Saudi Arabia shall be prepared regarding the financial status of the Company as of the date of issuance of the shareholders resolution to dissolve and liquidate the Company and establishing the Company's ability to discharge its obligations and its debts to third parties.

18.3 All entitlements of creditors must be paid in full or a settlement entered into with them. Otherwise, the Company shall not be liquidated until after a decision is

**المادة ١٨: انقضاء الشركة وتصفيتها**

١-١٨  تنقضي الشركة بأحد أسباب الانقضاء الواردة في المادة (١٥) من نظام الشركات، وبانقضاء الشركة تدخل في دور التصفية وفقاً لأحكام الباب الحادي عشر (١١) من نظام الشركات، مع مراعاة أنه في حالة التصفية الاختيارية يقوم الشركاء بتعيين مصفٍ واحد أو أكثر لغرض تصفية الشركة وعليهم تحديد صلاحياته/صلاحياتهم وأعماله/أتعابهم ويلزم اتخاذ الآتي:

٢-١٨  إعداد تقرير بالمركز المالي للشركة في تاريخ صدور قرار الشركاء بحل وتصفية الشركة معتمداً من محاسب قانوني مرخص له بالعمل في المملكة وثبت قدرة الشركة على الوفاء بالتزاماتها وديونها تجاه الغير.

٣-١٨  سداد جميع حقوق الدائنين أو إبرام صلح معهم، فإن تعذر ذلك فلا يتم تصفية الشركة إلا بعد صدور قرار من ديوان المظالم بشهر إفلاس الشركة بناءً على طلب الدائنين أو الشركة وفقاً

   

17

Head Office: P.O. Box 295 Jeddah 21412 Tel.: 662-1500 Fax 662-2475 Telex 607465 HASHIM SJ - C.C.3 4094 C.R. 4030023276 Capital SR 47,600,000 Fully Paid

شركة عبد الله هاشم للمعدات والغازات الصناعية المحدودة
**Abdullah Hashim Industrial Gases & Equipment Co. Ltd.**

issued by the Board of Grievances announcing the bankruptcy of the Company pursuant to a request by the creditors or the Company in accordance with the Commercial Court Regulations.

لنظام المحكمة التجارية.

**Article 19: Company Documents**

المادة ١٩: مستندات الشركة

The Company's letterhead shall clearly show the name of the Company, followed by the phrase "a limited liability company," as well as the address of its Head Office, its commercial registration number and its capital. All other documents shall comply with any applicable rules and regulations.

يجب أن يظهر بوضوح على مطبوعات الشركة اسم الشركة، مشفوعاً بعبارة "شركة ذات مسؤولية محدودة" وعنوان مركزها الرئيسي ورقم سجلها التجاري ورأسمالها. وتكون جميع المستندات الأخرى متوافقة مع أي من الأنظمة واللوائح المطبقة.

**Article 20: Notices**

المادة ٢٠: الإخطارات

20.1 Any notices given hereunder shall be deemed to be sufficiently given if in writing and delivered by pre paid registered mail or international courier or facsimile to such address as may be advised by one party to the Company from time-to-time.

٢٠-١ تعتبر جميع الإخطارات الموجهة بموجب هذا العقد على أنها مبلغة حسب الأصول إذا كانت خطية وتم إرسالها بالبريد المسجل المدفوع رسمه سلفاً أو بالبريد الدولي السريع أو بالفاكس إلى العنوان الذي يبلغه الشريك للشركة من وقت إلى آخر.

20.2 A notice shall be deemed to have been made and received: (i) when delivered, if sent by registered mail or international courier, or (ii) when dispatched and receipt is acknowledged by the receiving machine, if sent by facsimile.

٢٠-٢ يعتبر الإخطار على أنه قد سلم: (١) عند تسليمه، إذا أرسل بالبريد المسجل أو بالبريد الدولي السريع، أو (٢) عند إرساله واستلام إشعار الوصول من قبل جهاز الفاكس المرسل إليه، إذا أرسل بالفاكس.

**Article 21: General Provisions**

المادة ٢١: أحكام عامة

21.1 The Company shall be subject to all laws in effect in the Kingdom of Saudi Arabia.

٢١-١ تخضع الشركة لجميع الأنظمة السارية في المملكة العربية السعودية.

21.2 All matters not governed by these Articles of Association or otherwise agreed by the shareholders shall be governed by the Companies Regulations.

٢١-٢ كل ما لم يرد بشأنه نص في هذا العقد أو لم يتفق عليه الشركاء يطبق عليه نظام الشركات.

ISO - 9002 Approved          CGA Number 18          DUT Approved          PGA Approved



المركز الرئيسي: ص.ب ٥٩٥ جدة ٢١٤٢١ تليفون ٦٦٢٥٠٠ فاكس ٦٦٢-٢٤٢٥ تلكس ٦٠٧٤٦٥ هاشما س ج - س.ت ٤٠٩٤ س.ر ٤٠٣٠٠٢٣٢٧٦ رأس المال ٤٧٫٥٠٠٫٠٠٠ ريال سعودي مدفوع بالكامل
Head Office: P.O. Box 595 Jeddah 21421 Tel.: 662-6500 Fax 662-2425 Telex 607465 HASHMA SJ - C.C.J 4094 C.R. 4030023276 Capital SR 47,500,000 Fully Paid

**AHG** شركة عبدالله هاشم للمعدات والغازات الصناعية المحدودة
**Abdullah Hashim Industrial Gases & Equipment Co. Ltd.**

**Article 22: Language**

In the case of a discrepancy between the Arabic and English texts of these Articles of Association the Arabic text shall prevail.

**Article 23: Counterparts**

These Articles of Association have been executed in (7) counterparts of which each shareholder shall receive one counterpart. The remaining counterparts shall be submitted to the concerned authorities for purposes of registering the Company in the Commercial and Companies Registers.

**IN WITNESS WHEREOF**, these Articles have been executed as of the date first written above.

**Withdrawing Parties**

1.  **Mr. Mohammed Abdullah Hashim**

Signature: _____

2.  **Mr. Hashim Abdullah Hashim**

Signature: _____

المادة ٢٢ : اللغة

في حالة وجود خلاف بين النص العربي والإنجليزي، يعتد باللغة العربية.

المادة ٢٣ : نسخ العقـد

حرر هذا العقد من (٧) نسخ واستلم كل شريك نسخة واحدة للعمل بموجبها، وتقدم بقية النسخ للجهات الرسمية المختصة لتسجيل الشركة في سجل الشركات والسجل التجاري.

وإشهاداً على ذلك جرى التوقيع على هذا العقد بالتاريخ المذكور أعلاه.

الأطراف المنسحبة

١.   السيد/ محمد عبدالله هاشم

التوقيع: _____

٢.   السيد/ هاشم عبدالله هاشم

التوقيع: _____





19

ISO - 9002 Approved          CGA Member          DOT. Approved          PDA Approved

Head Office: P.O. Box 595 Jeddah 21421 Tel.: 662-1500 Fax 662-2425 Telex 607485 HASHIM SJ - C.C.J 4094 C.R. 4030023276 Capital SR 47.000.000 Fully Paid

**AHG.**  شركة عبدالله هاشم للمعدات والغازات الصناعية المحدودة
Abdullah Hashim Industrial Gases & Equipment Co. Ltd,

3.  Mr. Khaled Abdullah Hashim  السيد/ خالد عبدالله هاشم  .٣

Signature: _____  التوقيع: _____

4.  Mrs. Jihane Abdullah Saeed Sabouneh  السيدة/ جيهان معروف سعيد صابونة  .٤

Signature: _____  التوقيع: _____

5.  Ms. Imane Abdullah Hashim  السيدة/ إيمان عبدالله هاشم  .٥

Signature: _____  التوقيع: _____

United Welding & Supplies Co. Ltd  الشركة المتحدة لمعدات اللحام والتوريدات المحدودة

Represented by: _____  عنها:

Signature: _____  التوقيع:

Air Products Leasing B.V.  شركة اير برودكتس - ليسينج بي. في

Represented by: _____  عنها:

Signature: _____  التوقيع:

ISO - 9002 Approved     CGA Member     DOT Approved     PGA Approved

20



هذا العقد

٢٩

٤٥ ... ٢/٤/٢ ... ١٤٢٢/٧/٨هـ

١٤٢٢هـ

وزارة العدل

تصادق وزارة الخارجية (فرع منطقة مكة المكرمة)
على صحة الختم والتوقيع دون
مسئوليتها عن المحتويات
الرقم:

٢ ١ محرم ١٤٢٤

رئيس القسم الفنصلي

صلاح سليمان هاشم
Salah S. Hash